567 N.W.2d 724 (1997)
Tim WHITE, et al., individually and on behalf of the State of Minnesota, Appellants,
v.
MINNESOTA DEPARTMENT OF NATURAL RESOURCES, Respondent, and
Birch Terrace, et al., Defendant-Intervenors, Respondents.
No. C8-97-62.
Court of Appeals of Minnesota.
August 19, 1997.
*728 Elizabeth H. Schmiesing, Brian B. O'Neill, Richard A. Duncan, Faegre & Benson L.L.P., Minneapolis, for appellants.
Hubert H. Humphrey, III, Attorney General, Craig L. Engwall, Assistant Attorney General, David P. Iverson, Assistant Attorney General, St. Paul, for respondent Minnesota Department of Natural Resources.
Grant J. Merritt, Burber Timmer Zahn, P.L.L.P., Minneapolis, for Defendant-Intervenors, Repondents.
Considered and decided by NORTON, P.J., and PETERSON and AMUNDSON, JJ.

OPINION
PETERSON, Judge.
In this appeal from a summary judgment, appellants argue that the district court erred in determining that: (1) the Minnesota Department of Natural Resources is not required to prepare an environmental impact statement for a trail project, and (2) appellants failed to establish a prima facie case under the Minnesota Environmental Rights Act. We affirm in part, reverse in part, and remand.

FACTS
In 1975, the legislature authorized construction of the Northshore trail, beginning in Duluth, extending northeasterly through Two Harbors and Grand Marais, and ending at the Canadian border near the north shore of Lake Superior. The 146-mile section of the trail from Duluth to Grand Marais was completed in 1984. The remaining 40-mile section of trail from Grand Marais to the Canadian border was not completed in 1984 because the Grand Portage Indian Reservation's Business Committee denied respondent Minnesota Department of Natural Resources (DNR) permission to build the trail across reservation land. The Northshore trail has been used primarily by snowmobilers and hikers.
In 1988, the Cook County Board of Commissioners passed a resolution requesting that the Northshore trail be completed to the Canadian border. In 1990, the Grand Portage Indian Reservation announced its willingness to cooperate in completing the trail. In 1991, representatives from the DNR, the United States Forest Service (USFS), which was involved in the project because part of the proposed trail would pass through Superior National Forest, and the Grand Portage Indian Reservation met to discuss a preliminary route for the trail extension.
USFS and DNR personnel began assessing potential environmental impacts resulting from development of an identified trail corridor. A federal environmental assessment, completed by the USFS in 1993, concluded that no significant environmental impact would likely result from trail construction across USFS lands and recommended construction of a specified trail corridor. Following an appeal by local residents, the environmental assessment was withdrawn, and a broader review of the potential environmental impact of the entire trail extension, including evaluation of alternative routes, was undertaken by the USFS and the DNR.
*729 The DNR prepared an alternative form environmental assessment worksheet (AEAW) for the proposed trail extension. The AEAW addressed environmental effects that would or could result from the proposed trail extension, and dealt with issues of public concern. The AEAW analyzed three alternatives: (1) not constructing the proposed trail extension; (2) a southern trail route; and (3) a northern trail route.
After the AEAW was completed and made available for public review, a 30-day public comment and review period occurred. Following the comment and review period, the DNR issued a record of decision concluding that the proposed trail extension did not have the potential for significant environmental effects and therefore no environmental impact statement (EIS) was required for the project. The record of decision specifically addresses issues raised during the public comment and review period and states that its conclusion is
[b]ased on consideration of the criteria and factors specified in the Minnesota Environmental Review Program Rules to determine whether a project has the potential for significant environmental effects, and on the findings and record in this matter.
Appellants began this action against the DNR, alleging claims under the Minnesota Environmental Policy Act (MEPA) and the Minnesota Environmental Rights Act (MERA). Appellants sought a declaratory judgment compelling the DNR to prepare an EIS for the proposed trail extension and an injunction prohibiting the DNR from proceeding with construction of the trail extension. The district court granted respondents' motion for summary judgment.

ISSUES
1. Is the DNR's decision not to prepare an EIS supported by substantial evidence in the record and not arbitrary and capricious?
2. In deciding appellants' claims under MEPA and MERA, should the district court have considered evidence outside the administrative record?
3. May appellants maintain a MERA action against the DNR to challenge a project for which the DNR has conducted environmental review under MEPA?
4. Did appellants present a prima facie case under MERA?

ANALYSIS
On appeal from a summary judgment, this court must determine whether any genuine issues of material fact exist and whether the district court erred in applying the law. Offerdahl v. University of Minn. Hosps. & Clinics, 426 N.W.2d 425, 427 (Minn.1988). This court must view the evidence in the light most favorable to the nonmoving party. Id. The nonmoving party, however,
cannot rely on the pleadings alone to defeat a summary judgment motion but instead must produce specific facts which establish the existence of a genuine issue for trial.
Krogness v. Best Buy Co., 524 N.W.2d 282, 285 (Minn.App.1994), review denied (Minn. Jan. 25, 1995).
[S]ummary judgment on a claim is mandatory against a party who fails to establish an essential element of that claim, if that party has the burden of proof, because this failure renders all other facts immaterial.
Lloyd v. In Home Health, Inc., 523 N.W.2d 2, 3 (Minn.App.1994).

I.
Appellants contend that the district court erred in determining that the AEAW process used by the DNR for the trail extension project is exempt from MEPA and therefore shielded from judicial scrutiny. The district court, however, did not determine that the AEAW process used by the DNR is not subject to judicial scrutiny. The court made no specific determination regarding the AEAW process. The district court simply determined that because the Northshore trail was an enactment of the legislature, the trail extension project was exempt from MEPA, and, therefore, the DNR was not required to prepare an EIS.
Appellants argue persuasively that the trail extension falls within exceptions to the MEPA exemption for legislative enactments. *730 Under these exceptions, appellants contend, an EAW was mandatory. Therefore, the district court erroneously concluded that the trail extension is exempt from MEPA. Whether an EAW was mandatory, however, is a moot issue because an EAW was prepared.
The DNR elected to prepare a discretionary EAW under Minn. R. 4410.1000, subpt. 3D (1995) (discretionary EAW shall be prepared "when the proposer wishes to initiate environmental review to determine if a project has the potential for significant environmental effects"). For purposes of determining whether an EIS is required, the rules do not distinguish between a mandatory and a discretionary EAW. See, e.g., Minn. R. 4410.1000, subpts. 2-3 (1995) (addressing mandatory and discretionary EAW categories),.1200 (1995) (EAW content), .1400 (1995) (preparation of an EAW), .1700 (1995) (decision on EIS). The DNR requested permission from the Minnesota Environmental Quality Board (EQB) to use an alternative form for the EAW. The EQB chair may approve the use of an alternative EAW form. Minn. R. 4410.1300 (1995). EQB granted the request, and the DNR prepared an AEAW. Minn. R. 4410.1300 does not limit the use of an alternative form to a mandatory EAW. The DNR sought public comments on the AEAW. See Minn. R. 4410.1600 (1995) (30-day period for review and comment on EAW begins on day EAW availability notice is published). Finally, based on the AEAW and the comments received on the AEAW, the DNR determined that the trail extension does not pose potentially significant environmental effects and decided not to prepare an EIS. See Minn. R. 4410.1700 (1995) (decision on EIS). The district court determined that the DNR's decision not to prepare an EIS was supported by substantial evidence and was not arbitrary or capricious.
Appellants argue that the discretionary AEAW prepared by the DNR was deficient in that it did not contain information that it was required to contain under MEPA, and as a result, the DNR did not consider factors it was required to consider when deciding whether to prepare an EIS. This court
attaches a presumption of correctness to agency decisions and shows deference to an agency's conclusions in the area of its expertise. When reviewing any agency's determination, the court independently examines the agency's record and decision and need not defer to a lower court's decision on the same matter.
Agency decisions are reversed only when they reflect an error of law, the findings are arbitrary and capricious, or the findings are unsupported by substantial evidence. The court has endorsed the following definition of "substantial evidence":
1. Such relevant evidence as a reasonable mind might accept as adequate to support a conclusion;
2. More than a scintilla of evidence;
3. More than some evidence;
4. More than any evidence; and
5. Evidence considered in its entirety.
The substantial evidence test requires a reviewing court to evaluate the evidence relied upon by the agency in view of the entire record as submitted. If an administrative agency engages in reasoned decisionmaking, the court will affirm, even though it may have reached a different conclusion had it been the factfinder. The court will intervene, however, where there is a "combination of danger signals which suggest the agency has not taken a `hard look' at the salient problems" and the decision lacks "articulated standards and reflective findings."
Cable Communications Bd. v. Nor-West Cable Communications Partnership, 356 N.W.2d 658, 668-69 (Minn.1984) (quoting Reserve Mining Co. v. Herbst, 256 N.W.2d 808, 825 (Minn.1977)).
An agency ruling
is arbitrary and capricious if the agency: (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.
*731 Minnegasco v. Minnesota Pub. Utils. Comm'n, 529 N.W.2d 413, 418 (Minn.App. 1995), rev'd on other grounds, 549 N.W.2d 904 (Minn.1996).
Appellants argue that the AEAW failed to analyze adequately the cumulative potential effects of the trail extension because the only mention of cumulative impacts in the AEAW was that,
[c]ompletion of the final link of the North Shore State Trail is expected to increase use along the full length of the trail. An estimated 12,000 to 16,800 trips are expected by the 2000-2001 snowmobiling season along the North Shore Trail at a point just west of Grand Marais.
The AEAW, however, also contains the following additional cumulative effects analysis:
Increased recreational activity and tourism will positively affect the local and regional economy * * *, and have mixed, less measurable effects on communities within the affected area * * *. These effects are discussed in detail in supporting technical documents which are available from project proposer. Negative effects described in these reports are not anticipated to be of a lasting, measurable or regional significant nature.
Effects on the Grand Portage Reservation, the City of Grand Portage, Pigeon River and to the Ontario Trail System are expected to be similar to those described for eastern Cook County. Commerce encouraged by the presence of snowmobilers include resorts and lodging, restaurants and taverns, and gasoline and convenience stores. Although there are instances of such enterprises being located in remote areas, new facilities would most likely be constructed on property with ready access to year-round roads or highways. In most cases, connecting trail systems are already in place, so no major trail construction is anticipated. Some of these trails may eventually need to be improved to accommodate added use. Were the extension not constructed, it is reasonable to assume that the development pattern currently evolving in eastern Cook County would continue. That is, development of businesses based around homesteads, self-employment and low-intensity cottage industries. Examples include horse-powered logging, exotic bird raising, spiritual retreats, dog sledding and various forms of motorized and non-motorized recreation.
Although not very detailed, the analysis indicates that the DNR concluded the proposed trail extension would not significantly add to the environmental impact of the existing trail. An "EAW is not intended to be a detailed analysis of potential environmental impacts of a proposed project." Iron Rangers for Responsible Ridge Action v. Resources, 531 N.W.2d 874, 880 (Minn.App. 1995), review denied (Minn. July 28, 1995).
"The EAW is a brief document prepared in worksheet format which is designed to rapidly assess the environmental effects which may be associated with a proposed project" and to help determine "whether an EIS is needed."
Id. (quoting Minn. R. 4410.1000, subpt. 1 (1993)). Appellants do not contend that the analysis or its conclusion is contrary to the evidence in the administrative record. Cf. Trout Unlimited, Inc. v. Minnesota Dep't of Agriculture, 528 N.W.2d 903, 908 (Minn.App. 1995) (determination was arbitrary when contrary to evidence in the record), review denied (Minn. Apr. 27, 1995).
Appellants also argue that the DNR failed to consider the cumulative effect of the trail on the Grand Portage Indian Reservation. The AEAW states that "[i]ssues beyond the scope of this evaluation include * * * studies of impacts to the Grand Portage Reservation." The record of decision states that the DNR did not
conduct an in-depth social or economic analysis of potential project-related effects to the town of Grand Portage or to Grand Portage Band Members.
But the AEAW's cumulative effects analysis quoted above indicates that the DNR did consider likely effects on the Grand Portage Reservation.
Appellants also contend that the DNR failed to consider the cumulative effects of future spur trails on the Northshore trail. The DNR acknowledges that two spur trails *732 have been proposed by local residents and that they might be developed in the future. But the record of decision states, "No specific request for required DNR approval has been submitted. No known future projects are anticipated for this site." Because there were no specific plans for the spur trails, any effects they may have on the Northshore trail are speculative, and any consideration of these effects is equally speculative.
In Trout Unlimited, the record indicated that
it would be impossible to determine the potential for significant environmental effects associated with the irrigation project without determining the extent of future plans for farming and irrigation in the area.
528 N.W.2d at 908. Here, in contrast, appellants cite nothing in the record indicating that the Northshore trail's potential for significant environmental effects cannot be determined without determining the effects of two potential spur trails. In fact, appellants do not cite any evidence indicating that the spur trails will have any effect on the Northshore trail.
Relying on Trout Unlimited, appellants argue that the DNR improperly based its conclusion that the proposed trail extension did not have the potential for significant environmental effects on the possibility of future mitigation efforts. In Trout Unlimited, the Commissioner concluded:
Monitoring and permit conditions can identify significant impacts and modify or terminate the project if necessary.
Trout Unlimited, 528 N.W.2d at 909. This court decided:
Under the Commissioner's analysis, the irrigation project would go forward without an EIS and in the event significant environmental effects did occur, the Commissioner would then rely on monitoring or restrictive permitting procedures to reduce or eliminate those deleterious effects. The very purpose of an EIS, however, is to determine the potential for significant environmental effects before they occur.
Id. (emphasis in original).
Mitigation is an appropriate criterion to consider when determining the potential for significant environmental effects. Minn. R. 4410.1700, subpt. 7.C. In Trout Unlimited, the Commissioner did not consider environmental effects likely to result from the project or how any effects could be mitigated in determining the need for an EIS, but instead deferred those considerations until construction of the project was underway. Here, the AEAW extensively addresses the extent to which identified environmental effects can be mitigated:
No significant runoff problems are anticipated if mitigation measures are properly followed. Erosion control measures must also be appropriate for and tailored to site characteristics. Appropriate measures will include a mix of hay bales, check dams, seeding and mulching, silt fences, and sediment ponds. The Cook County Soil & Water Conservation District will be consulted prior to construction to determine recommended erosion control practices.
* * * *
* * * Wetland impacts resulting from filling or draining can be kept to a minimum by avoidance, minimization, and lastly, through mitigation. Whenever possible, wetland crossings will be winter-only, with summer trail users rerouted to existing roads and trails * * *. The use of winter crossings will help minimize the filling of natural functioning wetlands. Unavoidable wetland impacts must be mitigated for under the Wetland Conservation Act, Executive Order 91-3 and under the U.S. Army Corps of Engineers' Section 404 permit program.
Certain federally-protected wetlands may require avoidance rather than mitigation because artificially created wetlands are less effective at removing non-point source pollutants, and they do not always retain all of the characteristics of a naturally-functioning wetland. To increase the likelihood of successful mitigation, wetlands should be replaced in-kind and in-place. Natural wetland soils removed during trail construction should be used in mitigation areas to provide a seed bank for natural revegetation. Restoration or rehabilitation of previously degraded wetland areas *733 should also be considered for mitigation purposes.
* * * *
* * * Routing the trail away from ecologically-significant forest stands and through forest types more dependent upon disturbance (e.g., shade intolerant hardwoods) will minimize disturbance to sensitive natural communities. Efforts will also be made to avoid separating or isolating unbroken tracts of forest and to keep the trail corridor as narrow as possible through contiguous forest areas to reduce fragmentation effects. Trails & Waterways staff will route the final trail corridor carefully with the (on-site) assistance of DNR Wildlife and SNA staff to avoid designated or candidate "old-growth" stands, large "forest patches" and other high quality plant communities. Other suggested mitigation measures include following old roads or trails where possible, minimizing trail width and forest canopy gaps, and re-seeding disturbed areas promptly with native plant and grass species.
* * * *
* * * Concerns about soil erosion, sedimentation and impacts to water quality and stream habitat are most pronounced during trail construction when unstabilized soil is temporarily exposed to the elements. Culvert crossings also present a challenge during construction, due to the in-channel disturbance typically required during installation. However, sediment sources diminish with time as vegetation becomes reestablished on the fill material and along stream approaches.
Excavating will be kept to a minimum in order to minimize soil erosion and potential drainage problems. Where the trail passes over large rocks and boulders, the trail will be constructed by leveling low spots with fill rather than by cutting the area with heavy equipment. Rocks and soil disturbed during construction will be used whenever possible in trail construction. Excess material will be deposited at agreed upon waste areas and seeded to grass. Where the trail parallels an existing road, the trail will serve as a winter-only route, not requiring the installation of culverts.
Where the trail follows lakes, streams, rivers or ponds, the Cook County Shoreland Zoning Ordinance will be observed (i.e., setbacks, screening) and a suitable distance maintained between water bodies and the trail to protect water quality. Buffer strip width will be determined by the amount and type of vegetation, and by the slope and trail grade. Erosion control measures will be employed as appropriate (e.g., hay bales, check dams, seeding and mulching, silt fences, sediment ponds, etc.), along the full length of the extension, to prevent water movement down the trail causing erosion, soil sedimentation and degradation of water resources. Runoff will be directed into vegetated areas. Cut banks will also be revegetated with a native seed mix that is beneficial to wildlife.
* * * *
* * * Under normal wildland conditions, snowmobiles manufactured subsequent to 1975 should emit no more than 34 dB(A) at a distance of 300 yards  approximately the same level as a soft whisper [i.e., 35 dB(A)] at 5 feet. Still, in remote, semiprimitive recreation areas, like the interior of Cook County, even a much lower noise level is likely to give rise to annoyance, especially among those who have spent considerable time and dollars to escape noise and human activity. Conflicts thus seem inevitable, despite the advent of newer, quieter snowmobiles. These conflicts will be addressed by maximizing the distance between the trail corridor and year-round residences, and by reducing the speed of snowmobiles in inhabited areas. Vegetative screening and natural sound barriers will be used in problem areas, and careful trail planning, engineering and design should further reduce offending snowmobile noise. Even snowbanks and trees have been shown effective in reducing noise levels by up to 20 dB(A) when placed between machine and listener. These mitigative measures, coupled with strict enforcement of speed limits, should address most concerns regarding snowmobile noise. Continuing complaints will be dealt *734 with on a case-by-case basis by the Trail Manager.
Because the AEAW sets forth specific mitigation measures to address specific environmental effects, it was proper for the DNR to consider mitigation measures in determining the potential for significant environmental effects. See Iron Rangers for Responsible Ridge Action, 531 N.W.2d at 881 (when proposed mitigation measures were "more than mere vague statements of good intentions," county properly considered mitigation of the environmental effects in determining that an EIS was not required).
Based on the administrative record, we conclude that substantial evidence supports the DNR's decision that no EIS was required for the trail extension and the decision was not arbitrary and capricious.

II.
Appellants next contend that the DNR failed to address adequately the proposed trail extension's effects on several natural resources. Appellants submitted evidence regarding these effects that was not part of the administrative record and argue that because the AEAW was inadequate, the district court should have considered this evidence. The evidence includes deposition testimony and affidavits regarding potential environmental effects resulting from construction of the proposed trail extension, how the DNR decides whether an EIS is required, and how the DNR would address environmental concerns that could arise during construction. The DNR requested that the district court exclude the additional evidence. The district court did not rule on the request or refer to the evidence in its order or memorandum.
We first note that the record does not establish that the district court did not consider the evidence submitted by appellants. The evidence was not excluded by the district court, and it is part of the record on appeal.
"It is well to bear in mind that on appeal error is never presumed. It must be made to appear affirmatively before there can be reversal. Not only that, but the burden of showing error rests upon the one who relies upon it."
Midway Ctr. Assocs. v. Midway Ctr., Inc., 306 Minn. 352, 356, 237 N.W.2d 76, 78 (1975)(quoting Waters v. Fiebelkorn, 216 Minn. 489, 495, 13 N.W.2d 461, 464 (1944)). Because we independently examine the agency decision and do not defer to the district court's decision, however, we will discuss the purposes for which the evidence may be considered.
Minn.Stat. § 116D.04, subd. 2a(b) (1996), provides:
The responsible governmental unit shall promptly publish notice of the completion of an environmental assessment worksheet in a manner to be determined by the board and shall provide copies of the environmental assessment worksheet to the board and its member agencies. Comments on the need for an environmental impact statement may be submitted to the responsible governmental unit during a 30 day period following publication of the notice that an environmental assessment worksheet has been completed. The responsible governmental unit's decision on the need for an environmental impact statement shall be based on the environmental assessment worksheet and the comments received during the comment period, and shall be made within 15 days after the close of the comment period.
(Emphasis added.)
Under the plain language of the statute, the DNR was required to base its decision on the administrative record. Also, concerns about the adequacy of the EAW could have been raised during the comment period, and the DNR would have had an opportunity to apply its expertise in responding to the concerns. Had concerns been raised during the comment period, they would have become part of the administrative record. Permitting a reviewing court to consider evidence outside the administrative record when reviewing an agency decision that must be based on the administrative record raises the possibility that the court will second-guess the agency on the basis of the additional evidence. Therefore, evidence submitted for *735 the first time to the district court may only be considered for limited purposes.
The court may consider evidence outside the administrative record when (1) the agency's failure to explain its action frustrates judicial review; (2) additional evidence is necessary to explain technical terms or complex subject matter involved in the agency action; (3) the agency failed to consider information relevant to making its decision; or (4) plaintiffs make a showing that the agency acted in bad faith. Animal Defense Council v. Hodel, 840 F.2d 1432, 1436-37 (9th Cir.1988).
[A]llegations that an EIS has neglected to mention a serious environmental consequence, failed adequately to discuss some reasonable alternative, or otherwise swept "stubborn problems or serious criticism * * * under the rug," raise issues sufficiently important to permit the introduction of new evidence in the District Court, including expert testimony with respect to technical matters, both in challenges to the sufficiency of an environmental impact statement and in suits attacking an agency determination that no such statement is necessary.
County of Suffolk v. Secretary of the Interior, 562 F.2d 1368, 1384-85 (2d Cir.1977).
The evidence introduced for the first time in the district court, however, would be probative only insofar as it tended to show either that the agency's research or analysis was clearly inadequate or that the agency improperly failed to set forth opposing views widely shared in the relevant scientific community.
Id. at 1385.
An EAW is a brief document "designed to set out the basic facts necessary to determine whether an EIS is required for a proposed project." Minn. R. 4410.0200, subpt. 24 (1995). It is difficult to imagine a situation where there would not be additional information that could be included in an EAW. But appellants cannot defeat a motion for summary judgment simply by presenting additional evidence that was not considered by the DNR when making its decision. Instead, appellants must present evidence that the DNR failed in its responsibility to prepare an EAW "designed to set out the basic facts necessary to determine whether an EIS is required," either by avoiding an issue or by ignoring evidence about an issue that was addressed.
If the evidence submitted outside the administrative record demonstrates that the agency's effort was clearly inadequate or that the agency failed to set forth widely shared relevant scientific views, the court's proper function is to remand to the agency for correction of the agency's errors. Reserve Mining Co. v. Minnesota Pollution Control Agency, 267 N.W.2d 720, 723 (Minn. 1978).

Rare and Sensitive Plants.
Relying on evidence outside the administrative record, appellants argue that rare and sensitive plants will not be adequately protected. A sensitive plant survey conducted by the DNR did not include mosses and lichens and may have missed species of concern because it was done late in the growing season. But the record of decision states that a "biological survey will be conducted prior to construction to avoid disturbance to sensitive plants and animals." Cf. Iron Rangers for Responsible Ridge Action, 531 N.W.2d at 882 (in rejecting argument that EIS was needed because RGU failed to conduct extensive botanical survey, court noted that botanical survey would be conducted before construction permit was issued).
The DNR trail manager for the Northshore trail testified that if rare and sensitive plants were encountered during construction and the trail could not be rerouted, the plants would be sacrificed. Testimony that rare and sensitive plants may not be protected if discovered is not evidence that such plants exist or that DNR failed in its responsibility to consider rare and sensitive plants when preparing the AEAW. Appellants cannot avoid summary judgment by producing evidence of a mere possibility of harm to rare and sensitive plants. They must produce "specific facts which establish the existence of a genuine issue for trial." Krogness, 524 N.W.2d at 285.

*736 Wetlands.

The DNR trail manager also testified that the trail extension would cross some wetlands that cannot be avoided because of topography. Appellants submitted an affidavit in which a forest hydrologist opined that the trail manager was not qualified to perform wetlands delineation. This evidence simply challenges the DNR's discretion in accepting the manager's qualifications. It does not demonstrate that the DNR avoided any wetlands issue or ignored evidence about wetlands.

Trail Use Estimates.
Appellants argue that the DNR did not adequately address the environmental impact of the proposed trail extension because the DNR's estimates for trail use were too low. A study performed for the DNR contained a high-use estimate of 24,800 snowmobiles for the 1995-96 season. The DNR trail manager reduced the estimate to 17,800 trips. Appellants argue that this reduction was arbitrary. But the evidence offered by appellants indicates that the numbers included in the raw data given to the consultant who prepared the study were "crude at best." Also, the trail manager explained the limitations of the raw data and described the process of estimating future trail use as "guesswork." Although a different analysis of the data may have yielded a different decision, appellants did not establish that the DNR's analysis of the data was clearly inadequate.

Old Growth Forest.
Relying on a DNR internal memorandum outside the administrative record, appellants argue that the proposed trail extension would adversely impact old growth forest stands. But the memo concerned a northern trail route, which the DNR decided not to pursue.

Grand Portage National Monument.
In an affidavit outside the administrative record, the superintendent of the Grand Portage National Monument, stated that the proposed trail extension would adversely affect the monument because of impacts associated with noise, visual intrusion on the historic setting, and the likelihood that snowmobiles will use the monument as a snowmobile trail. But the AEAW and the record of decision state that the DNR will follow state and federal regulations governing preservation of historical sites. The affidavit does not establish that the DNR's consideration of the potential impact on historic settings was inadequate.

Quietude.
Relying on evidence outside the administrative record, appellants argue that the DNR failed to evaluate adequately the quietude issue. Appellants submitted an affidavit stating that the DNR relied on incorrect assumptions, including that snowmobiles will travel in a single file and well-spaced manner and that snowmobiles will not leave the trail, in preparing the AEAW. The affidavit also states that the AEAW failed to address the impact of snowmobile noise in conjunction with other activities, such as timber harvesting, and that the AEAW failed to address the effects of noise on nonmotorized trail users. But the record includes scientific data that support the conclusions in the AEAW and in the record of decision that the trail extension will have no significant noise impact.

Air.
Appellants presented evidence to the district court indicating that the use of the proposed trail extension could result in interstate highway levels of air pollution. The record demonstrates that in preparing the AEAW, the DNR relied on an EIS prepared by the Montana Department of Fish, Wildlife and Parks for its snowmobile grant program and on state and federal data on snowmobile emissions. Appellants' evidence may contradict the evidence in the record, but it does not demonstrate that the DNR avoided an issue or ignored evidence.

Water Resources.
Relying on evidence outside the administrative record, appellants argue that the proposed trail extension may adversely impact designated trout streams and lakes. Appellants presented affidavits indicating that pollution from snowmobiles could make the waters unsuitable for trout to live in. *737 Appellants specifically express concern about Trout Lake. But the AEAW states that the DNR will comply with Minnesota Pollution Control Agency rules to protect the quality of the Trout Lake fishery. Again, appellants' evidence does nothing more than contradict the evidence in the record.
The evidence appellants submitted outside the administrative record did not establish a material question of fact regarding whether the DNR clearly failed in its responsibility to prepare an EAW either by avoiding an issue that should have been addressed or by ignoring evidence about an issue that was addressed.

III.
MERA, Minn.Stat. §§ 116B.01-.13 (1996) permits any person to maintain a civil action for declaratory or equitable relief against another person
for the protection of the air, water, land, or other natural resources located within the state, whether publicly or privately owned, from pollution, impairment, or destruction * * *.
Minn.Stat. § 116B.03, subd. 1. The district court determined that appellants may bring an action against the DNR under MERA, but granted the DNR summary judgment on appellants' MERA claim because it concluded that appellants failed to establish a prima facie case. Appellants contend that the evidence they presented outside the administrative record established a prima facie case. The DNR argues that where environmental review has already occurred under MEPA, the scope of the district court's review of a MERA claim should be the same as the scope of review of a MEPA claim. Therefore, the DNR concludes, the district court should not have considered the evidence submitted outside the administrative record, and the court's review of appellant's MERA claim should have been limited to a determination whether the DNR's decision that the trail extension will not have significant environmental effects was arbitrary and capricious in light of the administrative record.
The DNR makes several policy arguments that MEPA and MERA have virtually identical purposes and remedies, and that, therefore, review on a MERA claim should be limited to the administrative record if environmental review has already occurred under MEPA. But the DNR cites no statutory language that distinguishes a MERA action following environmental review under MEPA from a MERA action where there was no environmental review.
Under MERA, the statutory definition of "person" includes "any natural person, any state, municipality or other governmental or political subdivision or other public agency or instrumentality." Minn.Stat. § 116B.02, subd. 2 (1996). Consequently, under the plain language of the statute, any natural person may maintain a civil action against a public agency for the protection of natural resources from pollution, impairment, or destruction. Appellants are natural persons who maintained such an action. Although appellants' MERA action is based on the same nucleus of facts as their MEPA action, the MERA action is an independent action brought originally in the district court. Unlike the MEPA action, the MERA action does not seek review of an agency decision. Therefore, there is no reason to limit the district court's scope of review as if it were reviewing an agency decision, and the district court was free to consider evidence outside the administrative record.
To establish a prima facie case under MERA, a plaintiff must show (1) the existence of a protectable natural resource; and (2) that defendant's conduct will or is likely to cause pollution, impairment or destruction of that resource. State by Schaller v. County of Blue Earth, 563 N.W.2d 260, 264 (Minn.1997). MERA defines "pollution, impairment or destruction," as "any conduct by any person which violates, or is likely to violate" any environmental quality standard, permit, or similar rule, or "any conduct which materially adversely affects or is likely to materially adversely affect the environment." Minn.Stat. § 116B.02, subd. 5 (1996).
Because almost every human activity adversely impacts a natural resource, and MERA cannot be construed "`as prohibiting virtually all human enterprise,'" Schaller, 563 N.W.2d at 265 (quoting State ex rel. *738 Wacouta Township v. Brunkow Hardwood Corporation, 510 N.W.2d 27, 30 (Minn.App. 1993)), the following factors are considered to determine whether conduct materially adversely affects, or is likely to materially adversely affect, the environment, and therefore, whether the second prong of a prima facie MERA case has been established:
(1) The quality and severity of any adverse effects of the proposed action on the natural resources affected;
(2) Whether the natural resources affected are rare, unique, endangered, or have historical significance;
(3) Whether the proposed action will have long-term adverse effects on natural resources, including whether the affected resources are easily replaceable (for example, by replanting trees or restocking fish);
(4) Whether the proposed action will have significant consequential effects on other natural resources (for example, whether wildlife will be lost if its habitat is impaired or destroyed);
(5) Whether the affected natural resources are significantly increasing or decreasing in number, considering the direct and consequential impact of the proposed action.
Id. at 267.
These factors are not exclusive and each factor need not be met in order to find a materially adverse effect. Rather, the factors are intended as a flexible guideline for consideration as may be appropriate based on the facts of each case.
Id.
When considering these factors in the context of a summary judgment motion, the court must view the evidence in the light most favorable to the nonmoving party. See Bennett v. Storz Broadcasting Co., 270 Minn. 525, 531, 134 N.W.2d 892, 897 (1965) (party moving for summary judgment has burden of proof and nonmoving party has benefit of view of evidence in light most favorable to him).
The district court concluded that appellants' concerns regarding the trail extension's effects on natural resources "are principally speculative in nature and in no event rise to the prima facie standard required to be met under MERA."
It appears, however, that in reaching this conclusion, the district court did not view the evidence in the light most favorable to appellants. The district court stated in its memorandum:
Defendant DNR made a determination that the Trail will not have significant effects on the environment, and Defendant has presented an ample body of evidence to support its decision. Defendant's determination was neither arbitrary nor capricious, and the Court must therefore defer to Defendant's judgment in the matter.
In evaluating the evidence in support of the MERA claim, the district court owed no deference to DNR's judgment. Rather, the court was to make its own determination whether the evidence, viewed in the light most favorable to appellants, established a prima facie case under MERA.
Viewing the evidence in the light most favorable to appellants, we conclude that appellants established a prima facie case under MERA. Appellants presented expert testimony that snowmobile exhaust emissions contain much greater amounts of carbon monoxide, nitrogen oxides, hydrocarbons, and particulate matter than are present in automobile exhaust. Consequently, the amounts of these substances present on the trail extension will exceed the level at which an air pollution permit would have to be obtained if the trail extension were a highway project.
Considering the first Schaller factor, exhaust emissions at a level that would trigger air pollution permit requirements for a highway project have an obvious adverse effect on air. Considering the second factor, air is present around the entire earth, and in that sense, is not rare, but at any given point on earth, only certain air is present, and in this sense, air is unique. Where air is polluted, there is no other air available to be used. Under the third factor, the expert testimony submitted by appellants indicates that the exhaust emissions will be present for portions of each year the trail is used; snowmobiles will not use the trail year-round. The *739 record does not indicate whether air currents or other processes will restore air quality during other portions of the year. Considering the fourth factor, the expert testimony indicates that exposure to certain pollutants in automobile exhaust presents a cancer risk and suggests that exposure to these pollutants at higher levels in snowmobile exhaust presents a greater cancer risk. Finally, considering the fifth factor, the quantity of air will not change significantly whether the trail extension is constructed or not.
Appellants' expert testimony regarding the effects the trail extension will have on air quality is subject to challenge at a later stage of the proceeding, but at this stage, we conclude that the testimony is sufficiently specific to establish a prima facie case that the trail extension is likely to have a materially adverse effect on the environment. We, therefore, reverse the grant of summary judgment on appellants' MERA claim and remand for further proceedings.
In remanding for further proceedings on the MERA claim, we do not intend to limit the proceedings to consideration of adverse effects the trail extension is likely to have on air quality. The air quality evidence was addressed in detail simply to explain the analysis that is to be applied to evidence of possible adverse environmental effects when determining whether a prima facie case has been presented. We also note that we agree with the district court that much of the evidence presented by appellants is conclusory or speculative, and as such, contributes little to the consideration of the five Schaller factors.

DECISION
DNR's decision not to prepare an EIS was supported by substantial evidence in the record and was not arbitrary and capricious. Evidence submitted by appellants outside the administrative record did not establish a material question of fact regarding whether the DNR clearly failed in its responsibility to prepare an EAW either by avoiding an issue that should have been addressed or by ignoring evidence about an issue that was addressed. Appellants presented a prima facie case that the Northshore trail is likely to have a materially adverse effect on the environment.
Affirmed in part, reversed in part, and remanded.