632 N.W.2d 230 (2001)
MINNESOTA CENTER FOR ENVIRONMENTAL ADVOCACY, Appellant,
v.
MINNESOTA POLLUTION CONTROL AGENCY, Respondent.
Boise Cascade Corporation, Intervenor, Respondent.
No. C6-01-96.
Court of Appeals of Minnesota.
July 24, 2001.
Review Granted September 25, 2001.
*232 Brian B. O'Neill, Richard A. Duncan, Elizabeth H. Schmiesing, Kristin R. Eads, Faegre & Benson, LLP, Minneapolis, for appellant.
Mike Hatch, Attorney General, Eldon G. Kaul, Leah M.P. Hedman, Assistant Attorneys General, St. Paul, for respondent Minnesota Pollution Control Agency.
Lloyd W. Grooms, Eric F. Swanson, Winthrop & Weinstine, P.A., St. Paul, for respondent Boise Cascade Corporation.
Considered and decided by AMUNDSON, Presiding Judge, LANSING, Judge, and SHUMAKER, Judge.

OPINION
GORDON W. SHUMAKER, Judge
Appellant Minnesota Center for Environmental Advocacy (MCEA) appeals from summary judgment in favor of respondent Minnesota Pollution Control Agency (MPCA), contending that the MPCA improperly decided against requiring a project-specific environmental impact statement (EIS) for a proposed modification of intervenor Boise Cascade Corporation's paper mill in International Falls. Appellant also challenges the district court's denial of its motion to supplement the administrative record.
Because the record does not adequately support respondent's conclusion that the *233 environmental impact of the Boise modification will not be such as to require an EIS, we reverse and remand. We need not reach the issue of the court's denial of appellant's motion to supplement the administrative record.

FACTS
Boise Cascade Corporation operates a paper mill on the Rainy River in International Falls. The mill consumes about 600,000 cords of wood annually to produce fiber from which pulp for the manufacture of paper products is derived. Approximately 55% of the wood is harvested from public timberlands within a 110-mile radius of International Falls.
Under consideration in this appeal is Boise's proposal to modify its paper mill. The modification will increase the emission of air pollutants, will increase wood usage to as much as 700,000 cords annually, and will require an expansion of the timber harvest area to a 150-mile radius, or more, from International Falls.
As the "responsible governmental unit" (RGU) for the evaluation of the impact of Boise's modification on the environment, the MPCA, with the assistance of Boise and the Minnesota Department of Natural Resources (DNR), prepared an environmental assessment worksheet (EAW). From public comment on the EAW, questions arose as to the nature and extent of the negative environmental impact of the project and the adequacy of measures to mitigate that impact. To answer those questions, the MCEA contended that a project-specific EIS would be necessary.
Because of the DNR's expertise in forestry conservation and management, the MPCA requested that the DNR address the issues that the MCEA and others raised. Noting that the level of timber harvesting proposed as part of Boise's modification would be consistent with that previously analyzed in a generic environmental impact statement (GEIS) prepared for the entire state between 1989-1994, the DNR concluded that a project-specific EIS would not be necessary.
The Minnesota Environmental Quality Board (EQB) approved the 1994 GEIS to assess the cumulative impact of timber harvesting in Minnesota. As described in the document itself, the GEIS is a global review that does not focus in detail on any particular project:
[B]ecause a GEIS is considered an alternative form of environmental review, projects under consideration by a GEIS are still subject to normal environmental review procedures and requirements, as well as environmental permit procurement procedures. In essence, a GEIS is considered a long-range planning document that can provide useful information regarding geographically broad and long-term consequences that are unlikely to be identified in project-specific environmental review processes. Therefore, a GEIS provides the context within which future project-specific EISs can be assessed.
In assessing the Boise project, the MPCA asked the EQB whether the GEIS is still adequate for evaluating the environmental effects of timber harvesting. The EQB qualifiedly said that it is:
While the Timber Harvesting GEIS is no longer as accurate as it was when it was completed, it is still accurate enough if used, interpreted, and qualified properly in project-specific review to adequately inform decision makers.
The GEIS identified numerous potentially significant adverse environmental effects of timber harvesting but stated that ownership constraints and mitigations would diminish the adverse impacts. However, the GEIS warned of the consequences *234 of failing to apply constraints and mitigations to timber harvesting:
Note that if these ownership constraints and mitigations are not routinely applied to all timber harvesting and forest management activities during the next 50 years, the number and severity of significant impacts * * * will increase for all three harvest levels.
Citing the GEIS and the "ongoing implementation of programmatic mitigation authorized under the Sustainable Forest Resources Act," the MPCA denied the MCEA's request for a specific EIS for the Boise project.
The MCEA sued the MPCA, challenging its determination that a project-specific EIS is not necessary for the Boise modification. After hearing cross-motions for summary judgment, the district court granted the MPCA's motion. The court noted that the EAW revealed that "there is a potential for the Boise Project to contribute adverse effects to the forest," but the court ruled that there was substantial evidence in the record that the adverse environmental effects would be mitigated:
MPCA found that the environmental effects of the Boise Cascade Project are subject to mitigation by ongoing public regulatory authoritythe third criterion to be considered in deciding if a project has the potential for significant environmental effects. MPCA's conclusions regarding the significance of the timber harvesting effects were guided in part by reliance on timber harvesting and forest management programmatic mitigation measures required under the Minnesota Sustainable Forest Resources Act * * *.
The court explained that the Minnesota Sustainable Forest Resources Act (MSFRA) created a public agency known as the Minnesota Forest Resource Council (MFRC) "to establish guidelines for mitigation, to monitor the status of implementation and compliance, and to report on those effects." According to the court, even though "it is true that MFRC does not have the authority to directly compel compliance with its guidelines," the MFRC can "recommend to the governor additional measures" to address significant adverse environmental impacts discerned by the MFRC.
From the summary judgment in the MPCA's favor, the MCEA takes this appeal, alleging principally that the MPCA's decision not to prepare an EIS was arbitrary and capricious and that the district court erred by failing to allow supplementation of the administrative record.

ISSUE
An EIS is required for any project that has potential for significant environmental effects unless those effects are subject to mitigation. Although measures have been identified for the mitigation of the environmental effects of a paper mill expansion, many of the measures have not been performed and there is no regulatory method to assure performance. Did the district court err by holding that the responsible governmental unit properly denied a request for an EIS for the paper mill project?

ANALYSIS
Although this is an appeal from a summary judgment, the proper standard of review is of
the proceedings before the decision-making body * * *, not the findings of the trial court. * * * We review the governmental body's determination on the basis of whether it was unreasonable, arbitrary, or capricious.
Iron Rangers for Responsible Ridge Action v. Iron Range Resources, 531 N.W.2d *235 874, 879 (Minn.App.1995) (citation omitted), review denied (Minn. July 28, 1995).
An agency ruling is arbitrary and capricious if the agency: (a) relied on factors not intended by the legislature; (b) entirely failed to consider an important aspect of the problem; (c) offered an explanation that runs counter to the evidence; or (d) the decision is so implausible that it could not be explained as a difference in view or the result of the agency's expertise.
White ex rel. State v. Minnesota Dep't of Natural Res., 567 N.W.2d 724, 730 (Minn.App.1997) (citation omitted), review denied (Minn. Oct. 31, 1997). An agency's decision is also considered arbitrary or capricious if "it represents the agency's will, rather than its judgment." Trout Unlimited, Inc. v. Minnesota Dep't of Agric., 528 N.W.2d 903, 907 (Minn.App.1995) (citations omitted), review denied (Minn. April 27, 1995). "Although the judiciary has the responsibility of ensuring that administrative agencies comply with legislative mandates, a presumption of administrative regularity exists." No Power Line, Inc. v. Minnesota Envtl. Quality Council, 262 N.W.2d 312, 325 (Minn.1977). Furthermore, the courts are to show deference to the agencies' expertise. Id.
An EAW is a document "designed to set out the basic facts necessary to determine whether an EIS is required for a proposed project." Minn. R. 4410.0200, subp. 24 (1999). An EIS must be prepared for any project that has the potential for significant environmental effects. Minn.Stat. § 116D.04, subd. 2a (1998); Minn. R. 4410.2000, subp. 3 (1999). In determining the potential for significant environmental effects, the RGU, here the MPCA, must consider four factors:
A. [the] type, extent, and reversibility of environmental effects;
B. [the] cumulative potential effects of related or anticipated future projects;
C. the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority; and
D. the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken by public agencies or the project proposer, [including EISs previously prepared on similar projects].
Minn. R. 4410.1700, subp. 7 (1999).
The responsible governmental unit's decision, after its consideration of the four factors, must be based on substantial evidence contained in the agency record. Iron Rangers, 531 N.W.2d at 880. "Substantial evidence" is relevant evidence considered in its entirety that is more than some evidence or a scintilla of evidence and is such that "a reasonable mind might accept as adequate to support a conclusion." White, 567 N.W.2d at 730.
The MPCA and Boise contend that, although the paper mill modification may have the potential for significant environmental effects, those effects are subject to mitigation by an ongoing public regulatory authority, namely, the MFRC. "[C]onditions mitigating the environmental consequences of an action may justify an agency's decision not to prepare an environmental impact statement." Alaska Ctr. for Env't v. United States Forest Serv., 189 F.3d 851, 860 (9th Cir.1999). However, mitigation measures must be more than "vague statements of good intentions," Iron Rangers, 531 N.W.2d at 881 (citation omitted), and mitigation is an important criterion to consider when determining the potential for significant environmental impacts. Minn. R. 4410.1700, subp. 7(C) (1999); see also White, 567 N.W.2d at 732. *236 Thus, "[m]itigation must `be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated.'" Neighbors of Cuddy Mountain v. United States Forest Serv., 137 F.3d 1372, 1380 (9th Cir.1998) (citation omitted).
The GEIS identified numerous mitigation strategies designed to address the environmental impacts of timber harvesting. In general, those strategies include the reduction of areas converted to non-forest uses; rotation practices; balance procedures for age-class and cover types; protection of sensitive species and sites; road and trail plans; visual management guidelines; creation of various inventories regarding biodiversity features, and old-growth, archaeological and historical sites; pest-management strategies; retention of slash, snag trees in clear-cut areas, and cavity trees; regulation of equipment use on forest lands; and plans to increase wood fiber productivity.
The governmental responses to the recommended mitigation strategies appear to fall into seven categories: (1) proposal of guidelines, (2) adoption of guidelines; (3) land purchases, (4) identification and classification plans, (5) identification and classification activities, (6) the establishment of committees to monitor and review forest activities, and (7) the development of miscellaneous strategies.
Although some of the mitigation strategies listed in the GEIS are being implemented to some extent, it appears from this record that most are at the guideline-development or planning stages, or that additional research will be necessary before guidelines and plans can be created. On this latter point, the EAW for the Boise project states
[t]he precise effects of cumulative timber harvest, at current and projected levels, on spatial patterns in forest landscapes within the area where Boise Cascade procures wood is not scientifically known. Research beyond the scope of this EAW is required to address this potential type of impact and apply the results in developing appropriate mitigation strategies * * *. However, because the GEIS did not evaluate landscape ecology issues, the applicability of the identified GEIS mitigation to address this issue is uncertain. Therefore, in this respect the applicability of the GEIS is limited. DNR can only identify that the project may affect the spatial distribution and connectivity of habitat types, but further research and analysis is required to assess whether the effects are potentially adverse and what mitigation are available. The need to initiate and conduct this type of research in Minnesota has been identified.
(Emphasis added.) The EAW additionally notes that
the potential project-related increase in timber harvest is of the type and extent envisioned in the GEIS analysis. [F]urther research is necessary to identify how timber harvest cumulatively affects the landscape-scale distribution of habitat types over time.
The court in Trout Unlimited, 528 N.W.2d at 909, said that the commissioner of agriculture's determination that an EIS was not necessary was error where the project had a potential for significant environmental effects and the commissioner's strategy was to "rely on monitoring or restrictive permitting procedures to reduce or eliminate those deleterious effects." The court said: "The very purpose of an EIS * * * is to determine the potential for significant environmental effects before they occur." Id.; cf. National Audubon Soc'y v. Hoffman, 132 F.3d 7, 17 (2d Cir.1997) (stating that the efficacy of the mitigation measures were assured because they were included as mandatory conditions *237 in the issued permits, required implementation of a detailed plan to monitor the effects of the proposed action and the mitigation of those effects, and required monitoring of the mitigation efforts, if any were made, to ensure that they were effective and required implementation of an alternative mitigation plan, spelled out in detail, if they were not) (citing Abenaki Nation of Mississquoi v. Hughes, 805 F.Supp. 234, 245 (D.Vt.1992), aff'd 990 F.2d 729 (2d Cir.1993)).
The efficacy of the mitigation measures for the Boise project is questionable for several reasons: A great number of the measures remain inchoate and subject only to future monitoring; there are inaccuracies in and omissions from the GEIS that require further research and investigation; some of the conclusions in the GEIS about mitigation are outdated; and none of the mitigation measures is assured because none is mandated to occur.
Although the legislature enacted the SFRA ostensibly to facilitate the implementation of the GEIS mitigation strategies, compliance with the MFRC's guidelines is voluntary. Thus, the MFRC does not truly perform a regulatory function. Without some assurances that mitigation measures can be compelled, even good-faith intentions can have an evanescent quality and the potential for unmitigated and irreparable environmental harm remains.
The MPCA argues that this case is a "mirror image" of National Audubon Soc'y v. Minnesota Pollution Control Agency, 569 N.W.2d 211 (Minn.App.1997), review denied (Minn. Dec. 16, 1997), a case dealing with the expansion of the Potlatch Corporation's timber-harvesting operation. Because we do not have before us the administrative record from National Audubon, we cannot tell whether or not the two cases are factually mirror images of each other. But we do know that the Potlatch EAW "targets specific mitigation measures that have been or will soon be implemented [to] address the environmental impacts associated with the Potlatch expansion." Id. at 217 (emphasis added). The MPCA contends that the "implementation status of present mitigation measures goes far beyond those existing at the time" of Potlatch.
The record here shows that some mitigation measures have been implemented but it does not show that other, seemingly important, measures have gotten beyond the guidelines or strategizing stage. Furthermore, we find it significant that monitoring of the compliance with and effectiveness of mitigation measures is substantially lacking. In its response to public comments the DNR said:
It is correct that effectiveness monitoring is yet to be fully realized as envisioned under the SFRA. SFRA directs the FRC, in conjunction with the DNR, to institute monitoring to determine trends and conditions of Minnesota's forests, compliance with necessary forest practices, and the effectiveness of these practices in mitigating potentially significant environmental effects. Compliance and effectiveness monitoring is an important element of the voluntarily approach that constitutes the State's policy to address the cumulative environmental effects of timber harvest as embodied in the SFRA. Based upon the results of this monitoring, the FRC is to report to the Legislature whether the State's forests are being used consistent with the policy vision offered under the Act.
Lack of data is the primary source of uncertainty tied to understanding compliance and effectiveness aspects of the recently adopted FRC guidelines.
We have a concern similar to that expressed in Trout Unlimited: What assurances *238 are there that reasonable mitigation measures will be in place before the harm is done? We find such assurances substantially lacking. Because of our disposition of this appeal, we need not decide the MCEA's challenge to the district court's denial of the motion to supplement the record.

DECISION
Considering the entirety of the record, the MPCA's conclusion that the potentially adverse environmental effects of the Boise project are subject to mitigation by ongoing public regulatory authority is not supported by substantial evidence. Therefore, we reverse and remand to the MPCA for preparation of a project-specific EIS.
Reversed and remanded.