**IRON RANGERS FOR RESPONSIBLE RIDGE ACTION, et al., Appellants,**

v.

**IRON RANGE RESOURCES, et al., St. Louis County, Respondents.**

No. C2–94–2245.

Court of Appeals of Minnesota.

May 16, 1995.

Review Denied July 28, 1995.

Joshua J. Kanassatega, Charles K. Dayton, Leonard, Street and Deinard, Minneapolis, for appellants.

Hubert H. Humphrey, III, Atty. Gen., Sherry A. Enzler, Asst. Atty. Gen., St. Paul, for respondents Iron Range Resources, et al.

Alan L. Mitchell, St. Louis County Atty., Michael R. Dean, Asst. County Atty., Duluth, Matthew B. Seltzer, Asst. Atty. Gen., St. Paul, for amicus curiae Minn. Dept. of Natural Resources.

Kim Z. Mastro, Ass'n of Minn. Counties, and Forrest D. Nowlin, Jr., Lawrence A. Moloney, Doherty, Rumble & Butler, P.A., St. Paul, for amicus curiae Ass'n of Minn. Counties.

Considered and decided by DAVIES, P.J., and RANDALL and MULALLY,* JJ.

## OPINION

EDWARD D. MULALLY, Judge.

In this appeal, the Iron Rangers for Responsible Ridge Action (the Rangers) and Minnesota Center for Environmental Advocacy (MCEA) challenge the district court's summary judgment affirming a determination of St. Louis County that an Environmental Impact Statement (EIS) was unnecessary for a golf course development project sponsored by the Iron Range Resources and Rehabilitation Board (IRRRB). The district court affirmed St. Louis County's determination that an EIS was unnecessary under the Minnesota Environmental Protection Act (MEPA) because it did not have the "potential for significant environmental effects." Minn.Stat. § 116D.04, subd. 2a (1992). We affirm.

On February 4, 1994, the St. Louis County Planning Commission (the county) issued a draft Environmental Assessment Worksheet (EAW) for the Giants Ridge Recreational Area Project (the project), a proposed golf course and housing development. After public hearings on the EAW and on the IRRRB's conditional use permit (CUP) application, on May 17, 1994, the county determined that an EIS was unnecessary, but required the IRRRB to complete four envi-

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by ap-

pointment pursuant to Minn. Const. art. VI, § 10.

ronmental studies before the CUP would be issued.

The Rangers and the MCEA sued the IRRRB and the county on June 9, 1994, and moved for summary judgment. The IRRRB and the county filed cross-motions for summary judgment. On October 17, 1994, the district court granted summary judgment for the IRRRB and the county. On October 20, 1994, the county issued CUP findings of fact, conclusions and its decision, and on October 24, the district court entered summary judgment in favor of the IRRRB and the county.

On November 2, 1994, the Rangers and the MCEA appealed summary judgment, and the county and the IRRRB filed a notice of review. The Association of Minnesota Counties (AMC), which represents 86 of Minnesota's 87 counties, filed an amicus brief in support of the county's decision not to prepare an EIS. The Department of Natural Resources (DNR) filed its amicus brief seeking a reversal of summary judgment and an order requiring the IRRRB to prepare an EIS.

## FACTS

The IRRRB is responsible for promoting development in the Iron Range area of Minnesota. *See* Minn.Stat. § 298.2213 (1992). In 1994, the IRRRB developed a master plan for the Giants Ridge Recreation Area, proposing a year-round recreation facility using existing alpine and nordic track facilities in St. Louis County. The property is owned by the State of Minnesota and operated by the IRRRB. The recreation area was established in 1984 when the Giants Ridge Alpine Ski Facility was built, and currently has alpine and nordic ski facilities, snowmobile trails, a housing development, power lines, city water and sewer lines, and county and state aid highways. The proposed project will have an 18–hole golf course, an upgrade and realignment of existing cross-country ski trails, and the possible future construction of 200 to 250 housing units with connections to existing city sewer and water lines. The IRRRB plans to construct and fund the golf course and cross-country ski trail realignment, but private investors will fund the housing development.

The IRRRB hired a private consulting firm, THK Associates, Inc., to develop the master plan, complete environmental studies, assist in economic planning, evaluate the feasibility of the project, and consider alternative sites. The IRRRB's consultants evaluated the natural and manmade elements affecting the project area and submitted their studies, with other environmental documents, for the county's consideration in the environmental review process required by MEPA, Minn.Stat. §§ 116D.01–.11 (1992). The IRRRB and the county agreed that the county, through its planning commission, would act as the responsible government unit (RGU) for environmental review of the project in accordance with Minn.R. 4410.0500, subpts. 1, 5 (1993).

On February 4, 1994, the county issued its draft EAW for the project for public comment. Minn.Stat. § 116D.04, subd. 2a(b); Minn.R. 4410.1600 (1993). On March 10, 1994, the IRRRB applied to the county for a CUP for the project. The county requested additional information from the IRRRB regarding drainage and surface water issues. The DNR, the Minnesota Department of Health, the Soil and Water Conservation District, other agencies, and interested citizens submitted their comments and concerns regarding forest fragmentation, botanical issues, and surface and ground water contamination. The IRRRB also submitted studies regarding water drainage.

During April and May 1994, the county conducted two public hearings on the EAW and on the CUP application. The county issued a negative declaration regarding the need for an EIS because the project did not have the "potential for significant environmental effects" under Minn.Stat. § 116D.04, subd. 2a. *See* Minn.R. 4410.1700, subpt. 7 (1993) (criteria for deciding environmental effects). The county based its findings and conclusions on a 2,000–page administrative record consisting of technical, professional and lay testimony and exhibits. Before the county would issue the CUP for the project, however, it required the IRRRB to submit four additional reports relating to water quality, rare plants, archeology and forest fragmentation.

On May 19, 1994, the Rangers sought review of the county's negative declaration on the EIS by the Environmental Quality Board (EQB). On June 7, 1994, after the EQB heard testimony from the IRRRB, the county, and the Rangers, it decided to take no action concerning the county's decision.

The Rangers and the MCEA sued the county on June 9, 1994, to prohibit the issuance of the CUP and project construction permits before an EIS was prepared. The Rangers and MCEA moved for summary judgment on the basis that: (1) the county was not the appropriate RGU and could not legally assume responsibility for environmental review under Minn.Stat. ch. 116D and Minn.R. 4410; and (2) the county erred in determining that the project did not have the "potential for significant environmental effects" where the project would affect ground and surface water, could harm the barren strawberry, the clustered bur reed, or the floating marsh marigold, and would cause forest fragmentation.

The IRRRB and county filed a cross-motion for summary judgment seeking the following determinations: (1) that the Rangers and MCEA lacked jurisdiction to challenge the county's designation as the RGU or, alternatively, that the county was a proper RGU; (2) that the project did not have the potential for significant effects and, therefore, the county's negative declaration was not arbitrary or capricious; and (3) that the Rangers lacked the legal capacity to sue in Minnesota under MEPA, and that the MCEA also lacked standing to bring the present suit.

On October 17, 1994, the district court granted summary judgment in favor of the county and the IRRRB, concluding that: (1) the Rangers were an unincorporated association lacking standing to sue under MEPA; (2) appellant MCEA had established that at least one of its members had standing because it could be significantly affected by the county's decision and by the construction of the golf course; (3) the county is an appropriate RGU for the project under Minn.R. 4410.0500, subpt. 5(B)(1); and (4) the administrative record supported the county's decision that the project did not have the poten-

tial for significant environmental effects and the decision was not arbitrary or capricious. The Rangers and the MCEA appealed to this court. Because the Rangers did not challenge the conclusion that they lacked standing, we consider the MCEA to be the only appellant in this proceeding.

## ISSUES

I. Was the county's determination that the project did not have the potential for significant environmental effects under Minn. Stat. § 116D.04, subd. 2a, arbitrary and capricious, and not based on substantial evidence in the record?

II. Did the district court err in concluding that the county was an appropriate responsible governmental unit to undertake environmental review of the project, which involved publicly and privately funded components?

III. Did the county act improperly by imposing official controls on the state government through the conditional use permitting process in violation of Minn.Stat. § 394.24, subd. 3?

## ANALYSIS

■ The MCEA seeks to prohibit construction of the project, alleging that the county and the IRRRB failed to comply with MEPA's environmental review requirements. In reviewing the district court's summary judgment affirming the county's negative declaration regarding the EIS, this court must consider the appropriate standard of review.

> In reviewing actions by a governmental body, the focus is on the proceedings before the decision-making body * * *, not the findings of the trial court. * * * We review the governmental body's determination on the basis of whether it was unreasonable, arbitrary, or capricious.

*Carl Bolander & Sons v. City of Minneapolis,* 502 N.W.2d 203, 207 (Minn.1993) (appellate review of city's determination that an environmental assessment worksheet was required for proposed concrete recycling facility) (citations omitted). In the case before this court, the district court granted sum-

mary judgment in favor of the county, the RGU. Yet, under Minnesota caselaw, this court applies the arbitrary and capricious standard by determining whether the county's decision is based on substantial evidence in the record. *See Swanson v. City of Bloomington*, 421 N.W.2d 307, 313 (Minn. 1988).

In *Swanson*, the district court affirmed by summary judgment the city's denial of a residential subdivision permit. The supreme court determined that where the city had created a "clear and complete record" of the permit decision, the district court and appellate courts could conduct review on that record. *Id.* at 312–13. "The standard of review is whether the municipal body's decision was unreasonable, arbitrary or capricious, with review focused on the legal sufficiency of and factual basis for the reasons given." *Id.* at 313. The supreme court affirmed summary judgment because it was based on an ample record, including the city's findings, the parties' memoranda, and complete hearing transcripts. *Id.* at 311–12.

In this case, the parties made cross-motions for summary judgment based on the extensive administrative record of the county's proceedings. As in *Swanson*, this court will review the administrative record to determine whether there is substantial evidence supporting the county's findings. *See Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825–27 (Minn.1977).

## I. Potential for Significant Environmental Effects

MEPA's purpose is "to force agencies to make their own impartial evaluation of environmental considerations before reaching their decisions." *No Power Line, Inc. v. Minnesota Environmental Quality Council*, 262 N.W.2d 312, 327 (Minn.1977). MEPA's procedures require governmental bodies to consider the significant environmental consequences of a project "to the fullest extent practicable." Minn.Stat. § 116D.03, subd. 1 (1992). The RGU reviews the EAW and the comments received from agencies and interested individuals. *See* Minn.Stat. § 116D.04, subd. 2b. "The EAW is a brief document prepared in worksheet format which is designed to rapidly assess the environmental effects which may be associated with a proposed project" and to help determine "whether an EIS is needed." Minn.R. 4410.1000, subpt. 1 (1993). Whereas the EAW is not intended to be a detailed analysis of potential environmental impacts of a proposed project, the EIS is a much more detailed study of all factors contributing to a significant impact on the environment. *Compare* Minn.Stat. § 116D.04, subd. 1a(c) *with id.* § 116D.04, subd. 2a (1992). The EAW filed in this matter is a 40–page document.

Where there is potential for significant environmental effects resulting from any major governmental action, the action shall be preceded by a detailed environmental impact statement prepared by the [RGU]. Minn.Stat. § 116D.04, subd. 2a. The EQB has identified four factors which the RGU must evaluate in determining whether a project has potential for significant environmental effects:

A. type, extent, and reversibility of environmental effects;

B. cumulative potential effects of related or anticipated future projects;

C. the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority; and

D. the extent to which environmental effects can be anticipated and controlled as a result of other environmental studies undertaken by public agencies or the project proposer, or of EIS's previously prepared on similar projects.

Minn.R. 4410.1700, subpt. 7 (1993). If the RGU determines that a proposed project does not have the potential for significant effects, it will issue a negative declaration and an EIS will not be required. *See id.*, subpt. 3.

The MCEA asserts that the project has potential for significant environmental effects because it will cause forest fragmentation, harm surface and ground water, and harm rare and endangered plants. The county and the IRRRB assert that the county, as RGU, properly prepared and issued the EAW, held public hearings, received extensive public

comments, and determined that the project did not have potential for significant environmental effects that would require an EIS. The district court sustained the county's determination and we agree. Here, the county's determination was based on substantial evidence in the record and was not arbitrary and capricious.

### A. Forest Fragmentation

 The MCEA alleges that the project will cause forest fragmentation, which ruins the habitat for forest dwelling birds and improves the conditions for certain bird predators. The DNR's comments suggest that forest fragmentation could disrupt the habitat for neotropical migrant songbirds by increasing access of the brownheaded cowbird, a brood parasite. However, there is no data showing there is a population of migratory songbirds in northern Minnesota that would be affected. The DNR is collecting statewide data on forest fragmentation to develop a forest policy. Yet, the county cannot be compelled to prepare an EIS on the basis of speculative factors. See Reserve Mining, 256 N.W.2d at 829-30 (MEPA does not provide absolute guarantees for environmental resources). Neither MEPA nor its federal equivalent, the National Environmental Policy Act (NEPA), requires that a decision of no significant impact must always be based only on the best available scientific methodology. See Greenpeace Action v. Franklin, 982 F.2d 1342, 1351-52 (9th Cir.1992). The MCEA has not shown scientific data documenting the DNR concerns about forest fragmentation, and the county had to make a reasoned analysis of the evidence before it. Id. Where there are technical disputes and uncertainties, the court must assume that the agency or RGU has exercised its discretion appropriately. See Coalition on Sensible Transp., Inc. v. Dole, 826 F.2d 60, 67 (D.C.Cir.1987).

The project site is composed of 250 noncontiguous wooded acres. The site is already substantially fragmented by the Giants Ridge Ski Area, the chalet and other related improvements, the Laurentian Condominiums, the county road system, cross-country ski trails, power lines and snowmobile trails. Still, project construction will leave over 100 acres of forest cover.

The MCEA asserts that forest fragmentation will affect the barren strawberry population, which is very rare in Minnesota. The barren strawberry is listed as "of special concern," but not "endangered." The effects of current forest management on this species are unknown. In view of this technical uncertainty, we must defer to the discretion of the county.

### B. Ground and Surface Waters

 The EAW states that the golf course construction will have an impact on ground and surface water because of the varied or higher temperature of water runoff and the herbicides used. The county asserts that the impact is not significant because there are adequate mitigation measures in the plan. The county heard evidence of extensive mitigation of ground and surface water runoff, both during construction and on the completed golf course. The county requested that the IRRRB make a detailed second phase risk assessment and deferred the issuance of a CUP to provide time to identify additional mitigation measures. Furthermore, state law and local permit controls regulate the use of herbicides and pesticides, and project compliance with those regulations weighs heavily in favor of a finding of no significant impact for an EIS. See Lockhart v. Kenops, 927 F.2d 1028, 1033 (8th Cir.1991), cert. denied, 502 U.S. 863, 112 S.Ct. 186, 116 L.Ed.2d 148 (1991) (zoning regulations of sewer systems would prevent seepage). The proposed mitigation measures are "more than mere vague statements of good intentions." See Audubon Soc'y v. Dailey, 977 F.2d 428, 435-36 (8th Cir.1992) (agency may base determination of no significant impact on fact that mitigation measures keep the impacts below significant level). The record contains scientific information showing there will be minimal ground water impact from the golf course. Here, the county did not err in considering mitigation of the environmental effects on ground and surface water in determining that an EIS is not required. See Minn.R. 4410.1700, subpt. 7.

### C. *Rare and Endangered Aquatic Species*

■ The MCEA and the DNR argue that the project could affect two aquatic species: the floating marsh marigold, a proposed endangered plant species, and the clustered bur reed, an endangered species. The floating marsh marigold has been found only six times in Minnesota and its decline is attributed to a reduction of water levels. The DNR is concerned that the golf course's effect on water quality could threaten the floating marsh marigold. The county asserts that the plant is listed as "proposed endangered" because there has been no field examination of potential habitat. The clustered bur reed grows in floating mats in emergent wetlands and has been found in four places in northern Minnesota, none of which is located in the areas proposed for project development. The county determined that because the project does not require landfill or wetland drainage and because mitigation measures will preserve natural drainage flow, it is unlikely that these plants will be affected by the project.

The MCEA argues that the IRRRB's failure to do an extensive 260–acre botanical survey of the project shows that an EIS is required to protect these two species. However, the RGU should consider "the extent to which environmental effects can be anticipated and controlled as a result of other environmental studies undertaken by public agencies or the project proposer." Minn.R. 4410.1700, subpt. 7(D). The IRRRB will conduct a botanical survey before the county will issue the CUP for the project, a factor that the county was required to consider. *See id.*

### D. *Feasible and Prudent Alternative*

■ The MCEA asserts that the county failed to show there is no feasible and prudent alternative for the project. Minn.Stat. § 116D.04, subd. 6 (1992); *see also State v. County of Hennepin,* 495 N.W.2d 416, 426 (Minn.1993) (government action reversed for failure to show lack of feasible alternative construction site). The MCEA argues further that the county improperly rejected alternative sites solely for economic reasons: "Economic considerations alone shall not jus-

tify" state action significantly affecting the quality of the environment. Minn.Stat. § 116D.04, subd. 6.

The county must pursue alternative project sites only where there is a threshold determination that the proposed "state action significantly affect[s] the quality of the environment." *See id.* Because the RGU determined the project does not have the potential for significant environmental effects, a study of project alternatives is not required.

■ Even if the county were required to evaluate alternatives, the concept of a feasible alternative is a limited one. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215–16, 55 L.Ed.2d 460 (1978) (agency only required to consider truly feasible alternatives). Here, the project's goal is to create a year-round resort using the existing Giants Ridge Ski Area. The EAW shows that the county and THK Consultants considered alternative sites to achieve this objective and the types of soil, vegetation and hydrology in the area for the golf course. The RGU need not consider speculative alternatives. *See Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 436 (5th Cir.1981).

## II. Responsible Government Unit (RGU)

■ The MCEA challenges the designation of the county as the RGU for the project, and claims that because the county lacks jurisdiction to impose "official controls" over state lands, it cannot be the RGU that enforces environmental regulations. The district court determined that the county and the IRRRB properly agreed to designate the county as the RGU under Minn.R. 4410.0500, subpt. 5, which states:

> For any project * * * which falls into more than one category [where an EAW is mandated] or for which the RGU is in question, the RGU shall be determined as follows:
>
> A. When a single governmental unit proposes to carry out or has sole jurisdiction to approve a project, it shall be the RGU.

B. When two or more governmental units propose to carry out or have jurisdiction to approve the project, the RGU shall be the governmental unit with the greatest responsibility for supervising or approving the project as a whole. Where it is not clear which governmental unit has the greatest responsibility * * *, the governmental units shall either:

(1) by agreement designate which unit shall be the RGU * * *; or

(2) submit the question to the EQB chairperson.

Minn.R. 4410.0500, subpt. 5. The project falls into two categories where the rules mandate an EAW because the project includes proposed residential housing and clearcutting of more than 80 acres of forest. *See* Minn.R. 4410.4300, subpts. 19, 28(B) (1993). Therefore, the district court did not err in affirming the county's and the IRRRB's agreement over the RGU designation under Minn.R. 4410.0500, subpt. 5(B)(1).

The DNR argues that the IRRRB is the only appropriate RGU under Minn.R. 4410.0500, subpt. 1 (1993), which requires that the state agency should be the RGU for mandatory EAW categories. Rule 4410.0500, subpt. 1 reflects the EQB's preference that the governmental unit with the greatest responsibility for supervising or approving a project be the RGU. *Id.* Thus, state agencies ought to serve as RGU for their own projects. The DNR claims that here, where the IRRRB proposed the project, it must be the RGU.

We affirm the designation of the county as the RGU because the project is a hybrid project. The IRRRB will develop the golf course, but private developers will complete the housing and will be subject to county zoning ordinances and permitting requirements. Therefore, the project is not exclusively carried out by a state agency within the meaning of Rule 4410.0500, subpt. 1. The county is the designated RGU for the housing component under Minn.R. 4410.4300, subpt. 19, and the IRRRB's development of the golf course and cross-country ski facility will conform with the county's land use regulations. Thus, the county will have considerable authority over both aspects of the project and is a proper RGU under MEPA and the environmental rules.

Because we affirm the designation of the county as the RGU under the Minnesota Rules, we need not address the question of whether the IRRRB is a state agency under MEPA and the Minnesota Administrative Procedure Act. Nor must we address the question of whether the doctrine of res judicata bars the MCEA and the DNR from challenging the county's designation as RGU where the issue was not raised at the EQB hearings on the project.

### III. Official Controls and CUPs

#### A. *Official Controls*

■ The MCEA argues that, as a state agency, the IRRRB will improperly subject itself and its state lands to the county's "official controls" through its agreement to comply with the county zoning ordinance. Minn. Stat. § 394.24, subd. 3 (1992) provides that "no land owned or leased by the federal or state government shall be subject to official controls of the county." The county's CUP process is one of its official controls. *See id.* § 394.22, subds. 6, 7 (1992). The project is located on state lands and the Commissioner of the IRRRB agreed to submit the project to the county's land use regulations. The IRRRB also agreed to comply with 15 conditions in the project's design to meet the county's zoning and land use regulations.

Minnesota law does not preclude the county from exercising control over state lands under Minn.Stat. § 394.24, subd. 3. Chapter 394 generally authorizes counties to "carry on county planning and zoning activities," *id.* § 394.21, and the state may waive its right to regulate its own property and permit local regulation of state property, *see Watson Constr. Co. v. City of St. Paul,* 260 Minn. 166, 168–69, 109 N.W.2d 322, 335 (1961). In this case, County Zoning Ordinance No. 46, art. 11, § 4 provides: "No land owned or leased by the State of Minnesota shall be subject to the provisions of this ordinance unless agreed to by the state government." Here, the IRRRB's primary purpose is economic regional development, but it lacks extensive land use expertise. It would be impractical to prohibit state units of government from

submitting to local land use and building controls because local government units have extensive experience and expertise in comprehensive land use planning.

### B. *RGU Reliance on the CUP Process*

The MCEA and the DNR argue that the county and the district court improperly relied on the CUP process in finding that the project did not have the potential for significant environmental effects. The DNR claims that the county's findings of fact, conclusions, and decision of May 17, 1994, improperly combine the negative declaration for an EIS with an order conditioning the CUP on the completion of four additional studies. Therefore, the county's negative declaration for an EIS was improperly based on mitigation through the CUP process.

The DNR asserts that the county improperly emphasized two of the criteria for determining whether a project has the potential for significant environmental effects:

C. the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority; and

D. the extent to which environmental effects can be anticipated and controlled as a result of other environmental studies undertaken by public agencies or the project proposer, or of EIS's previously prepared on similar projects.

Minn.R. 4410.1700, subpt. 7.

First, the DNR argues that the CUP process does not provide ongoing regulatory authority sufficient to mitigate the environmental effects of the project. *See id.,* subpt. 7(C). Once the CUP issues and the golf course is constructed, there is permanent and irreversible action which the CUP process cannot control. Second, the RGU should have considered only completed studies that were part of the administrative record as of May 12, 1994. *See id.,* subpt. 7(D). If the RGU could make its decision based on incomplete studies, the RGU could avoid the need for an EIS by simply ordering additional future studies.

Third, an EIS would differ from the four studies in several fundamental respects. The EIS content would be determined by a public scoping process which insures that the EIS provides a comprehensive overview of all environmental impacts of the project, *see* Minn.Stat. § 116D.04, subd. 2a(a), (e); Minn.R. 4410.2100 (1993), including appropriate alternatives, *see* Minn.Stat. § 116D.04, subd. 2a; Minn.R. 4410.2300(G). Also, the draft EIS would be available for public review and comment before the RGU gives its final approval, insuring complete review by the public and governmental agencies before public funds are used. *See* Minn.Stat. § 116D.04, subd. 2a(b); Minn.R. 4410.2600 (1993).

We do not believe that the record shows that the county improperly relied on the CUP process to determine the need for an EIS. Before the review process began, the IRRRB agreed to seek a CUP for the golf course component of the project, and the county intended to consider separately the EAW under MEPA and the CUP application under the county zoning ordinances. The county first determined that there was sufficient information to issue a negative declaration for the project. Second, the county determined that it lacked sufficient information to issue a CUP for the golf course, and delayed its decision until it received the additional information on archeological issues, forest fragmentation, turf management, and botanical issues. The county considered "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority." Minn.R. 4410.1700, subpt. 7(C). Since the CUP is a form of ongoing public regulation of the golf course, the county was obligated to discuss the CUP in its findings.

We believe the facts in this case are distinguishable from those in *Trout Unlimited, Inc. v. Minnesota Dept. of Agriculture,* 528 N.W.2d 903 (Minn.App.1995), *pet. for rev. denied* (Minn. Apr. 27, 1995), where this court reversed and remanded for the preparation of an EIS. In that case, the DNR, Department of Health, and Pollution Control Agency commented that the proposed irrigation project could have the potential for sig-

nificant environmental effects. Moreover, it was impossible to determine the likely impact of herbicides, insecticides, and fungicides on a nearby stream without knowing the amount of the expected chemical input. *Id.* at 908–09. Nonetheless, the Commissioner concluded that because the owner would need to obtain a chemigation permit before applying pesticides and fertilizers, significant impacts could be considered at that time and the project could then be modified or terminated, if necessary. *Id.* at 909. The Commissioner's decision was reversed because he abandoned his duty to determine whether the irrigation project would have significant environmental effects by deferring the issue to future permitting decisions. *Id.*

In view of the comprehensive information in the EAW, the agency and public comments, and the extended public hearings, the record does not suggest that the county's CUP conditions were a subterfuge to avoid an EIS. We affirm the county's findings because they are supported by substantial evidence in the record and they are not arbitrary and capricious. *See Carl Bolander & Sons,* 502 N.W.2d at 207; *Swanson,* 421 N.W.2d at 312–13.

## DECISION

The agreement of the county and the IRRRB that the county should be the RGU was in accordance with EQB rules for the selection of an RGU. Minn.R. 4410.0500. The county has experience in land use and in environmental issues and has great responsibility for carrying out the project.

■ The administrative record contains substantial evidence supporting the county's determination that the project does not have the potential for significant environmental effects which would require an EIS. We affirm the county's decision because it was not arbitrary and capricious. Having determined that there was no potential for significant environmental effects, the county's requirement that four additional studies be completed as a condition for issuing a CUP was not arbitrary and capricious. Even if the CUP decision was not separate from the question of whether an EIS was needed, the county would have complied with Minn.R. 4410.1700, subpt. 7's requirement that the RGU consider other environmental studies and mitigation by land use regulation.

Because we affirm the county's designation as the RGU under Minn.R. 4410.0500, we need not address the MCEA's motion to strike the portions of the Association of Minnesota Counties' brief referencing the EQB proceedings. The motion is dismissed.

**Affirmed.**

DAVIES, Judge (concurring specially).

I concur with the majority opinion in its entirety, but write separately because I believe, in addition, that the MCEA lacks standing to challenge the designation of the county as the RGU. The designation of a RGU is probably not ever appropriate for judicial review. And if designation ever is subject to judicial review, the MCEA here failed to exhaust its administrative remedies.

The selection of the RGU is an assignment of administrative responsibility within the government's structure. Minnesota Rule 4410.0500 (1993) provides the procedure and time limits for government units to designate among themselves the RGU. Where two or more government units with apparent jurisdiction cannot agree on the selection of the RGU, the EQB chairperson is to determine which unit should be the RGU. Minn.R. 4410.0500, subpt. 5(B)(2) (1993). And, if there has been a prior choice of a RGU by another agency, the EQB has the prerogative to trump that selection "if the EQB determines a new designee has greater expertise in analyzing the potential impacts of the project." *Id.,* subpt. 6 (1993). In all cases where the RGU is designated by the EQB chairperson or by agreement of eligible government units, the selection must be made "within five days of receipt of the completed data portions of the EAW." *Id. See also* Minn.R. 4410.0500, subpt. 5(B)(1) and (2) (1993) (placing five-day limit on selection process).

The IRRRB and the county agreed to make the county the RGU. The county was a reasonable choice, even if not the most appropriate RGU, because of its land use expertise and permit authority over the pro-

886

ject. *See* Minn.R. 4410.0500, subpt. 1 (1993) (RGU for mandatory categories); Minn.R. 4410.4300, subpts. 19, 28 D (1993) (mandating the RGU for projects involving residential development and forested lands). Selection of the county was not trumped by the EQB chair and became conclusive.

Here, the MCEA did not request that the EQB designate the IRRRB as the RGU when the county issued the EAW in February 1994. The MCEA failed to challenge the selection of the county as RGU in May 1994 when the MCEA sought the EQB's review of the county's negative declaration for the EIS. The MCEA first challenged the designation of the county as the RGU on June 9, 1994, when it sued the county to compel the preparation of an EIS before project construction. Clearly, the MCEA failed to exhaust its administrative remedies by not seeking the EQB's determination on the appropriate RGU in the initial stages of the environmental review process, as contemplated by Minn.R. 4410.0500. *See Adams v. United States Envtl. Protection Agency*, 38 F.3d 43, 50 (1st Cir.1994) (to promote judicial economy and application of agency's expertise, court declined to consider issues not raised during administrative process).

Moreover, even if the IRRRB had been selected as a RGU, the parties and this court would be exactly where we are now: this court would be reviewing the merits of the RGU's negative declaration of the need for an EIS. Thus, for us now to review the designation of the RGU would only create further delay in the environmental review process.