BERNE AREA ALLIANCE FOR QUALITY LIVING, et al., Appellants,

v.

DODGE COUNTY BOARD OF COMMISSIONERS, et al., Respondents.

No. A04–1287.

Court of Appeals of Minnesota.

April 12, 2005.

James Pierce Peters, Peters & Peters, P.L.C., Alexandria, MN, for appellants.

Jay Thomas Squires, Ratwik, Roszak & Maloney, P.A., Minneapolis, MN, for respondents.

Considered and decided by RANDALL, Presiding Judge; MINGE, Judge; and WRIGHT, Judge.

## OPINION

WRIGHT, Judge.

In this appeal of the district court's entry of summary judgment, appellants Berne Area Alliance for Quality Living, et al. (collectively BAA), challenge the district court's determination that respondents Dodge County and its Board of Commissioners did not act arbitrarily and capriciously in concluding that an environmental impact statement (EIS) for the construction of a hog confinement facility was not required. The county argues that Minn.Stat. § 116D.04, subd. 2a(d) (2004), exempts the proposed facility from environmental review. BAA counters that because that statute was enacted after the county's EIS decision, it cannot be applied here, and that, even if the statute does apply, it is not satisfied. BAA also contends that the Minnesota Pollution Control Agency (PCA), not the county, is the responsible governmental unit for permit approval. We affirm in part and reverse in part.

## FACTS

Mark Finstuen, who had a feedlot for 35 steers, applied for a conditional use permit (CUP) and other permits that would allow him to build and operate a hog feedlot that, while having a capacity of significantly more than 1,000 animal units (AUs), would be used to house only 995 AUs, including the 35 steers. His proposal included a plan for applying the manure produced by the feedlot, in lieu of fertilizer, to surrounding land in such a manner that there would be no net increase in the amount of nitrates applied to the land. After considering Finstuen's application, his Environmental Assessment Worksheet (EAW), and other environmentally related information, the county made a negative declaration regarding the need for an EIS for the proposed project and granted the application. BAA sued the county, seeking a declaratory judgment that an EIS was required. Both sides moved for summary judgment. Although it did not initially question the county's authority to determine the need for an EIS, BAA argued in support of its summary judgment motion that the responsible governmental unit (RGU) for decisions regarding the EIS and issuance of the permits was the PCA, rather than the county.

The district court denied BAA's motion for summary judgment and granted the county's motion. The district court ruled that (a) the capacity of the proposed feedlot exceeds 1,000 AUs; (b) because the capacity of the proposed feedlot exceeds 1,000 AUs, Minn.Stat. § 116D.04, subd. 2a(d) (2004), which exempts from environmental review proposed feedlots having a capacity of fewer than 1,000 AUs, did not apply; (c) the county was the proper RGU to issue Finstuen's permits; and (d) the county's negative declaration regarding the need for an EIS was not arbitrary or capricious. BAA appealed, and the county filed a notice of review, arguing that the exemption in Minn.Stat. § 116D.04, subd. 2a(d), applies here.

## ISSUES

I. Is a proposed feedlot that is capable of holding more than 1,000 animal units but

will actually hold fewer than 1,000 animal units exempt from environmental review under Minn.Stat. § 116D.04, subd. 2a(d)(1) (2004)?

II. Did the county have the authority to grant permits for construction and operation of the proposed feedlot?

## ANALYSIS

■■■ When reviewing a summary judgment affirming a negative declaration regarding the need for an EIS, we focus "on the proceedings before the decision-making body ... not the findings of the [district] court." *Iron Rangers for Responsible Ridge Action v. Iron Range Res.*, 531 N.W.2d 874, 879 (Minn.App. 1995), *review denied* (Minn. July 28, 1995). Our review of an agency's consideration of environmental factors is limited, and we will intervene only when the record suggests "the agency has not taken a 'hard look' at the salient problems" and its decision lacks "articulated standards and reflective findings." *White v. Minn. Dep't of Natural Res.*, 567 N.W.2d 724, 730 (Minn. App.1997) (quoting *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977)), *review denied* (Minn. Oct. 31, 1997); *see also Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 465 (Minn.2002) (stating that appellate court has limited review of agency's decision).

## I.

"Where there is potential for significant environmental effects resulting from any major governmental action, the action shall be preceded by a detailed [EIS] prepared by the [RGU]." Minn.Stat. § 116D.04, subd. 2a (2004). After BAA initiated this action, the legislature amended the environmental-review statute to exempt from review feedlots with a capacity of fewer than 1,000 AUs. 2003 Minn. Laws ch. 128,

art. 3, § 40. The parties dispute whether the amended statute applies here and, if it does, whether the exemption applies.

## A.

■■■ We begin with an analysis of the applicability of the amended statute. The United States Supreme Court has stated that "[w]hen the intervening statute authorizes or affects the propriety of prospective relief, application of the new provision is not retroactive" and is, therefore, permitted. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 273–74, 114 S.Ct. 1483, 1501, 128 L.Ed.2d 229 (1994). Under Minn.Stat. § 116D.04, subd. 10 (2004), adverse EIS determinations may be challenged in a declaratory judgment action, as happened here. Because the amendment to Minn. Stat. § 116D.04, subd. 2a, precludes environmental review of certain proposed feedlots, the amendment "affected" the availability of the relief BAA sought (a declaratory judgment requiring environmental review in the form of an EIS). Thus, applying the new statute is not improperly retroactive, and the amended statute applies here.

## B.

■■■ Having concluded that the amended statute is applicable, we next consider whether the proposed feedlot is exempt from environmental review. To be exempt from environmental review under the amended statute, a proposed feedlot must, among other things, have "a capacity of less than 1,000 [AUs.]" Minn.Stat. § 116D.04, subd. 2a(d)(1)(i). The crux of the parties' disagreement is whether "capacity" is to be measured physically or legally. BAA argues that "capacity" is measured by the number of AUs that the proposed project can actually accommodate (physical capacity). The county counters that "capacity" is measured by the

number of AUs that Finstuen may, under the relevant permits, house in the project (legal capacity).

The relevant statutes and rules do not define "capacity." To support its argument that "capacity" means legal capacity, the county cites Finstuen's "Minnesota Pollution Control Agency Permit Application for an Animal Feedlot or Manure Storage Area." While the application refers to "maximum capacity," it does not define "capacity." Also, reading "capacity" for purposes of the exemption as legal capacity, rather than physical capacity, is inconsistent with certain feedlot rules. For example, feedlot permit applications must contain "a list of all animal types, and the maximum number of animals of each animal type *that can be confined* within each lot, building, or area at the animal feedlot[.]" Minn. R. 7020.0505, subp. 4(A)(4) (2003) (emphasis added). The common meaning of "that can be confined" suggests physical capacity, rather than legal capacity. Also, the "expansion" of a feedlot is defined as "*construction* or any activity that has resulted or may result in *an increase in the number of animal units that an animal feedlot is capable of holding* or an increase in storage capacity of a manure storage area." Minn. R. 7020.0300, subp. 11a (2003) (emphasis added). Given the definition of "expansion," construing "capacity" in this provision as legal capacity, rather than as physical capacity, would equate an application to increase the number of animal units being housed at an under-utilized feedlot with the construction of a new feedlot.

■ Thus, we reject the county's argument that "capacity" refers to legal capacity, rather than physical capacity, not only because this creates incongruence between both of these rules, but also because such construction is inconsistent with the common meaning of the statutory term. *See* Minn.Stat. § 645.08(1) (2004) (stating that words in statutes are to be construed according to their "common and approved usage"); Minn.Stat. § 645.001 (2004) (stating that provisions of chapter 645 "govern all rules becoming effective after June 30, 1981[,]" unless specifically provided otherwise). We conclude that the "capacity" for determining whether a proposed project is exempt from environmental review under Minn.Stat. § 116D.04, subd. 2a(d), is physical capacity rather than legal capacity. And it is undisputed here that the physical capacity of the proposed the feedlot exceeds 1,000 AUs. The proposed feedlot, therefore, is not exempt from environmental review.

## II.

■ In its motion for summary judgment, BAA asserted that the PCA, rather than the county, should have addressed whether an EIS was required. The district court ruled that the county was the RGU for addressing that question. In its request for reconsideration, BAA challenged this determination, and the district court declined to address it because motions for reconsideration are disfavored and because BAA's argument on the point was unfocused. On appeal, BAA again argues that the PCA, rather than the county, was the RGU and should have determined whether an EIS was required.

■ It is undisputed that Finstuen's proposed project requires a permit from an RGU. "Any Minnesota county board may, by resolution, with approval of the [PCA], assume responsibility for processing applications for permits required by the [PCA] under this section for livestock feedlots[.]" Minn.Stat. § 116.07, subd. 7 (2004); *accord* Minn. R. 7020.1500 (2003). Regarding the jurisdiction of administrative agencies generally, the Minnesota Supreme Court has stated:

Jurisdiction of an administrative agency consists of the powers granted it by statute. Lack of statutory power betokens lack of jurisdiction. It is therefore well settled that a determination of an administrative agency is void and subject to collateral attack where it is made either without statutory power or in excess thereof.

*McKee v. County of Ramsey,* 310 Minn. 192, 195, 245 N.W.2d 460, 462 (1976) (quoting *State ex rel. Spurck v. Civil Serv. Bd.,* 226 Minn. 253, 259, 32 N.W.2d 583, 586 (1948)). Because a county's assumption of the responsibility to process feedlot permit applications is derivative of the PCA's authority to process those applications, the county's authority to process applications for feedlot permits is necessarily subject to the same limits on its authority and jurisdiction. Questions of an agency's jurisdiction and authority over a particular area are subject to de novo review. *Frost–Benco Elec. Ass'n v. Minn. Pub. Utils. Comm'n,* 358 N.W.2d 639, 642 (Minn.1984).

A county assuming the responsibility to process feedlot permit applications is referred to as a "delegated county." *See* Minn. R. 7020.0300, subp. 9a (2003) (defining "[d]elegated county" as one that has "received authorization pursuant to part 7020.1600, subpart 3a, item C, to implement an animal feedlot program"); *see also* Minn. R. 7020.1600, subp. 3aC (2003) (stating that, to assume responsibility for administering a feedlot program, county must, among other things, "[r]eceive written authorization from the commissioner [of the PCA] to administer the [feedlot program]"). And "processing" a feedlot permit application "may include, at the option of the county board, issuing, denying, modifying, imposing conditions upon, or revoking permits pursuant to the provisions of this section or rules promulgated pursuant to it[.]" Minn.Stat. § 116.07, subd. 7(b).

Here, the county's written decision not to require an EIS states that it is the RGU "as a delegated County in partnership with the [PCA.]" This delegation occurred pursuant to the county's Resolution for the Establishment of a County Animal Feedlot Program dated April 17, 1980. Under the PCA-approved Permit Application Processing Procedure associated with that delegation, the county agreed to forward to the director of the PCA "all animal feedlot permit applications" in certain categories, including "[a]nimal feedlots of 1,000 animal units or more[.]" While Finstuen's proposed animal feedlot has a *capacity* of more than 1,000 AUs, it will *house* only 995 AUs. And Finstuen has indicated that, at present, he does not plan to increase the number of AUs housed at the proposed facility. Therefore, it could be argued that Finstuen's proposed facility does not run afoul of the limits on the scope of the authority that the PCA delegated to the county. However, we reject this argument as inconsistent with the rules.

Delegated counties "shall" process permit applications as set forth in Minn. R. 7020.1600, subp. 4aA–D (2003). Minn. R. 7020.1600, subp. 4a (2003). Under these provisions, "[t]he county feedlot pollution control officer shall forward to the commissioner [of the PCA] for issuance all permit applications and all other applicable documents, comments, and recommendations" in several categories of applications, including "all facilities that are required to apply for a permit under part 7020.0405, subpart 1, item A or B[.]" Minn. R. 7020.1600, subp. 4aB(1). Minn. R. 7020.0405, subp. 1A, B(1) (2003), require a National Pollutant Discharge Elimination System permit for feedlots fitting the definition of a "concentrated animal feeding operation" (CAFO), and a "State disposal system" permit for "the construction and

operation" of a non-CAFO feedlot or manure storage area *"capable* of holding 1,000 or more [AUs] or the manure produced by 1,000 or more [AUs]." (Emphasis added.)

Although the record does not address whether Finstuen's proposed feedlot is a CAFO, the record is uncontroverted that Finstuen's application proposes the construction and operation of a feedlot that is "capable" of holding more than 1,000 AUs. Thus, if the proposed feedlot is a CAFO, it requires a permit under Minn. R. 7020.0405, subp. 1A; and if it is not a CAFO, it requires a permit under Minn. R. 7020.0405, subp. 1B(1). Because in either case the proposed feedlot requires a permit under rule 7020.0405, subpart 1, item A or B, the county was required to forward Finstuen's permit application to the PCA. Minn. R. 7020.1600, subp. 4aB(1).

The county lacked authority to issue permits for Finstuen's proposed feedlot and was required to forward Finstuen's permit application to the PCA. We, therefore, reverse the county's grant of Finstuen's permit application. In light of our decision that the PCA, not the county, is the RGU, we need not address the parties' disputes as to other aspects of the county's processing of Finstuen's feedlot permit application.

## DECISION

Because Mark Finstuen's proposed feedlot is physically capable of housing more than 1,000 animal units, and because Minn. Stat. § 116D.04, subd. 2a(d) (2004), exempts from environmental review only feedlots that are physically capable of housing fewer than 1,000 animal units, the statute does not exempt Finstuen's proposed feedlot from environmental review. Dodge County has assumed responsibility to process feedlot applications under Minn. Stat. § 116.07, subd. 7 (2004). However, because Finstuen's proposed feedlot is of a type listed in Minn. R. 7020.0405, subp. 1A, B (2003), Minn. R. 7020.1600, subp. 4aB (2003), rendered the PCA the responsible governmental unit and required the county to forward Finstuen's feedlot permit application to the PCA.

**Affirmed in part and reversed in part.**

MINGE, Judge, concurring specially.

I join in the opinion of the court, and concur to add comments regarding the potential cumulative effect of the proposed livestock facility.

The law provides that: "Where there is potential for significant environmental effects resulting from any major governmental action, the action shall be preceded by an environmental impact statement (EIS) prepared by the responsible governmental unit." Minn.Stat. § 116D.04, subd. 2a (2004); *see also* Minn. R. 4410.1700, subp. 1 (2003). In determining the effects of governmental action, the law requires that an environmental assessment worksheet (EAW) be prepared for certain types of activity. Minn.Stat. § 116D.04, subd. 2a(a) (2004). The Environment Quality Board (EQB) has determined that an EAW is required for certain feedlot proposals including all with a capacity exceeding 1,000 animal units. Minn. R. 4410.4300, subp. 29, item A (2003). A determination of environmental effects and the EAW must include an evaluation of the "cumulative potential effects of related or anticipated future projects." Minn. R. 4410.1700, subp. 7, item B (2003). This effect is defined as one which "results from incremental effects of the project in addition to other past, present and reasonably foreseeable future projects regardless of what person undertakes the project." Minn. R. 4410.0200, subp. 11 (2003).

Mark Finstuen proposed to expand an existing 35–head cattle feeding operation by constructing two hog confinement buildings in which he planned to place

2,400 sows (960 animal units). We have upheld the district court determination that the physical capacity of the two proposed buildings is over 1,000 animal units. There is evidence that they could house as many as 1,440 animal units. Dodge County considered the impact of Finstuen's proposed feedlot based on its having 995 animal units and found that "Finstuen had no plans to expand at this site." The county did not define whether this conclusion meant that there was no plan to construct additional buildings or no plan to further utilize the proposed buildings to house an additional 480 animal units, nor did the county determine whether the capacity of 480 additional animal units represent a cumulative potential impact or effect. If this physical capacity is considered a part of the potential cumulative effect, the EAW should have recognized that entire capacity in determining whether this project has a significant environmental effect.

It is tempting to ignore the capacity of a facility and only look at the number of animal units proposed to be housed in the buildings under a permit application. However, as the opinion of this court explains, physical capacity is a key concept in the statutes. Furthermore, ignoring the physical capacity is at variance with plain meaning of the phrase "potential cumulative impact" and disregards the foreseeable economic pressures to utilize buildings once constructed. This is the time to assess the impact. The record is silent on why the buildings would not be used at maximum capacity and whether there are alternative uses for the buildings. If their highest and best economic use is as a hog facility, the evaluation of the impact of already constructed buildings should not be deferred until the force of economic necessity weighs heavily for exceptions and variances.

From the record, it appears that if the potential cumulative effect includes the full physical capacity of the proposed buildings, several matters need further analysis to determine whether the project would have a significant environmental effect and whether an EIS is needed. One is the farmland available for spreading manure from the facility. Dodge County found that 1,200 acres were needed to handle the manure and that that acreage had been identified. At full capacity, 50% more animal units would be in the facility and 1,800 acres of land would apparently be needed. The Pollution Control Agency (PCA) commented some fields have steep slopes and that Finstuen's plan to spread manure after fall harvest delays absorption of nutrients until the next growing season. The significance of these comments on needed or appropriate acreage for manure application is unclear. However, the EAW should analyze the acreage needed to properly handle the potential cumulative effect of these considerations and, given the reported extensive Karst formations in the area, whether suitable acreage is available for manure application without creating a significant environmental effect.

Another example of the importance of fully assessing the potential cumulative effect is groundwater quality. The record indicates that water from private wells serving the nearby church and many residents is not potable. Only water from deeper wells that reach lower aquifers is potable. The EAW assumes that continued application of historic levels of fertilizer will not create a potential for significant environmental impact. It does not appear that the EAW considered the risk of yet further degradation of the water table including the risk to deeper aquifers from continued application of fertilizer at historic approved levels and whether the potential cumulative impact of the facility proposed by Finstuen will establish a demand for manure application that will contribute to the current groundwater problem. This risk and potential impact is important in

assessing whether there is a significant environmental effect from the proposed facility.

The potential cumulative effect of odor from a facility operating at capacity and other matters may similarly be important. This court is not the appropriate body to determine the potential cumulative environmental effects. The responsible governmental unit should make these determinations.

We have concluded that the PCA has jurisdiction to determine the need for an EIS and to issue permits for feedlots with a capacity greater than 1,000 animal units. The PCA is the responsible governmental unit. Presumably, the PCA had the duty to prepare or at least approve the adequacy of the EAW. In this case the EAW and environmental analysis were handled and determined by Dodge County. The parties have not argued and we do not reach the question of the status of the EAW or the environment analysis based on its authorship.