CITY OF BLOOMINGTON, Appellant,

BLOOMINGTON AMPHITHEATER COALITION, Appellant,

v.

CITY OF BURNSVILLE, Respondent.

Nos. C6–02–1985, C3–02–2009.

Court of Appeals of Minnesota.

July 29, 2003.

Lawrence A. Moloney, Peter K. Beck, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN; and David R. Ornstein, City of Bloomington, Bloomington, MN; and David L. Sasseville, Lindquist & Vennum, P.L.L.P., Minneapolis, MN, for appellants.

George C. Hoff, Kimberly B. Kozar, Hoff, Barry & Kuderer, P.A., Eden Prairie, MN, for respondent.

Considered and decided by TOUSSAINT, Chief Judge; HARTEN, Judge; and MINGE, Judge.

## OPINION

TOUSSAINT, Chief Judge.

In these combined appeals, Bloomington and Bloomington Amphitheater Coalition challenge the responsible governmental unit's (Burnsville's) negative declaration on an environmental-impact statement for a proposed outdoor amphitheater under the Minnesota Environmental Policy Act (MEPA). On appeal from the district court's affirmance of Burnsville's decision and from the entry of summary judgment against Bloomington, Bloomington argues that the record supports both a mandatory and discretionary environmental-impact statement. The appeal also raises the question of whether the courts may consider evidence outside of the agency record in their review of the responsible government unit's decision. Because the record establishes that the threshold for a mandatory environmental-impact statement was met, we reverse and remand.

## FACTS

Developer Rose Wild, LLC proposed the construction of a new outdoor amphitheat-

er in the City of Burnsville, near its northern border with Bloomington and the Minnesota River. The proposed Black Dog Amphitheater would be located in the Minnesota River Valley on part of a 159.9–acre property owned by R.B. McGowan and used as the Freeway Landfill, known as a superfund site.[1]

Burnsville was designated the responsible governmental unit (RGU) for environmental review of the project under the Minnesota Environmental Policy Act, Minn.Stat. §§ 116D.01–.11 (2002) (MEPA). The City of Bloomington and a neighborhood association, Bloomington Amphitheater Coalition (BAC) (collectively "Bloomington"), petitioned the Minnesota Environmental Quality Board (MEQB) to appoint the Minnesota Pollution Control Agency (MPCA) as the RGU, but the MEQB denied the request.

Burnsville proposed and published an environmental-assessment worksheet (EAW) on the project. On July 20, 2000, after a comment period, the Burnsville City Council held a special meeting to decide whether an environmental-impact statement (EIS) was needed. In its record of decision (ROD) dated the same day, it issued a negative declaration, determining that the Black Dog Amphitheater EAW met the required environmental review, so neither a mandatory nor a discretionary EIS would be needed.

A few weeks later, Bloomington filed a written request with the Metropolitan Council seeking a Metropolitan Significance Review of the proposed amphitheater pursuant to Minn.Stat. § 473.173 (2002). The issue to be reviewed by the council was whether the amphitheater would have a noise impact on existing and planned land uses in Bloomington. Mediation commenced with representatives of Bloomington, BAC, Citizens Alliance for Responsible Ecology (CARE), Burnsville, and Rose Wild. The parties' representatives agreed to a further acoustical study.

Mediation continued by mutual consent until October 2, 2001, when an impasse was declared. The administrative law judge (ALJ) appointed by the Metropolitan Significance Review Committee held hearings in November 2001. On December 10, 2001, the ALJ recommended that the committee determine a method to proceed that assures that Rose Wild adhere to the planned-unit-development (PUD) requirements and commitments it made during the hearing. The committee adopted the ALJ's findings and conclusions that anticipated amphitheater noise will not cause substantial physical adverse effect and will not have metropolitan significance. It also responded to the ALJ's concern about the PUD requirements and other Rose Wild commitments by requiring that the Metropolitan Council enter into a binding agreement with Rose Wild to require compliance. The agreement would also require ongoing noise monitoring by an independent third party at Rose Wild's expense. Rose Wild entered into an agreement with the Metropolitan Council on December 26, 2001.

While the metropolitan-significance review was in progress and before the ALJ's recommendation was issued, Burnsville approved an amendment to the PUD for the amphitheater. It specifically amended the 2000 PUD to limit the capacity of the amphitheater to "19,700 people, including all patrons, facility staff (including security and parking staff), entertainer/promoter

---

1. The United States Department of the Interior is on record stating that projects proposed on or in the vicinity of the superfund site should be developed only if compatible with necessary management of the superfund site and subject to the approval of the MPCA and the U.S. Environmental Protection Agency.

staff and any other authorized personnel." This PUD amendment is referenced in the Metropolitan Council's agreement with Rose Wild.

Just after the parties requested metropolitan-significance review from the Metropolitan Council, Bloomington, and the BAC commenced actions in Dakota County District Court against Burnsville. The two actions were consolidated but not actively litigated until after the metropolitan-significance review decision in December 2001.

Shortly after the metropolitan-significance review decision, the parties filed cross-motions for partial summary judgment on Count I of the consolidated actions, which alleged that the amphitheater was designed for or had capacity for 20,000 or more people and met the threshold for a mandatory EIS. After a hearing, the court issued its March 25, 2002, order granting Burnsville summary judgment on Count I. The court concluded that "[t]he [Burnsville City] Council had sufficient information before it that the capacity of the amphitheater would be less than 20,000."

After the March 25 order issued on Count I, Bloomington moved in limine to exclude any evidence developed after the ROD. On June 19, the court denied the motion, stating that the PUD Agreement and any other "regulatory controls" put into effect after the ROD are admissible in the district court litigation. It also denied Bloomington's request to conduct its own acoustical sound study. The court granted Burnsville's motion to amend its answer to include the defenses of res judicata and collateral estoppel, and it noted that the Metropolitan Council proceedings would be admissible pursuant to those doctrines.

On June 14, Bloomington moved for partial summary judgment on Counts II and III, which alleged that the project has the potential for significant environmental effects, requiring a discretionary EIS.

Burnsville filed a cross-motion for summary judgment. The court explained in the memorandum attached to its October 4, 2002 order that Burnsville prevails on Counts II and III whether the court views only the "narrow record" or all of the regulatory controls (PUD agreement, Metropolitan Council Significance Review, and Rose Wild agreement with the Metropolitan Council). The court also ruled that the findings of the Metropolitan Council are accorded collateral-estoppel effect. Judgment was entered against Bloomington on November 14, 2002, and the cases were dismissed.

Bloomington and the BAC filed a notice of appeal from the judgment and the orders granting Burnsville summary judgment.

## ISSUES

I. Did the respondent responsible governmental unit err when it determined that the amphitheater project was designed for, and could be expected to have, peak attendance of fewer than 20,000 people?

II. Did the district court properly use evidence outside of the responsible governmental unit's record in affirming that determination?

III. Did the responsible governmental unit err when it determined that a discretionary environmental-impact statement was unnecessary because the amphitheater project does not have the potential for significant environmental effects?

## ANALYSIS

When reviewing a district court's summary judgment affirming an agency's negative declaration regarding the need for an environmental-impact statement (EIS), this court focuses "on the proceedings be-

fore the decision-making body * * *, not the findings of the trial court." *Iron Rangers for Responsible Ridge Action v. Iron Range Res.*, 531 N.W.2d 874, 879 (Minn.App.1995) (quotation omitted), *review denied* (Minn. July 28, 1995). "Agency decisions are reversed only when they reflect an error of law, the findings are arbitrary and capricious, or the findings are unsupported by substantial evidence." *White v. Minn. Dep't. of Natural Res.*, 567 N.W.2d 724, 730 (Minn.App.1997)(quotation omitted), *review denied* (Minn. Oct. 31, 1997); *Accord Iron Rangers*, 531 N.W.2d at 879–80.

This dispute centers on the construction of the administrative rule setting the threshold for a mandatory EIS. The legislature has authorized the MEQB to establish by rule, categories of actions for which an EIS is required. Minn.Stat. § 116D.04, subd. 2a(a) (2002). Under the rule, an EIS is mandatory for construction of a new outdoor entertainment facility that meets or exceeds the following threshold: "designed for or expected to accommodate a peak attendance of 20,000 or more persons." Minn. R. 4410.2000, subp. 2, 4400, subp. 22 (2001). The MEQB has explained that "[t]he number of participants is to be counted as part of the attendance" in applying this threshold. Minnesota Environmental Quality Board, *Guide to the Minnesota Environmental Review Rules* 31 (Apr.1998).

The rules create a presumption that a facility of the magnitude indicated in the threshold has "potential for significant environmental effects." Minn. R. 4410.1700, subp. 1 (2001). Such potential requires an EIS. Minn.Stat. § 116D.04, subd. 2a. If the threshold is not met, the RGU may order an EIS when it determines that there is substantial evidence of "the potential for significant environmental effects." Minn. R. 4410.2000, subp. 3 (2001).

Bloomington argues that the evidence before the RGU when it made its negative declaration on July 20, 2000, was that the capacity of the proposed amphitheater was 20,000 or more persons. Burnsville argues that there was substantial evidence that the amphitheater was designed for 19,500.

The environmental-review process begins with the EAW, which is "a brief document * * * designed to set out the basic facts necessary to determine whether an environmental-impact statement is required for a proposed action." Minn.Stat. § 116D.04, subd. 1a(c) (2002). The RGU's determination "on the need for an environmental-impact statement shall be based on the environmental assessment worksheet and the comments received during the comment period." *Id.*, subd. 2a(b)(2002). The RGU is required to support its decision with specific findings of fact in a record that also included specific responses to all substantive and timely comments on the EAW. Minn. R. 4410.1700, subp. 4 (2001).

While Burnsville agrees that there are "a number of conflicting statements regarding the design capacity in the EAW record," it states that Burnsville's clear intent was to limit attendance through ongoing regulatory controls so that the project will never reach the mandatory EIS level. Contrary to Burnsville's argument, the RGU's intent is not determinative. MEPA contemplates that the relatively brief, factual EAW, the comments of interested parties, and the responses of the RGU will be used to determine if the threshold has been met.

There are conflicting statements in the briefs and the EAW regarding "design," "capacity," "seating," and "attendance." Although the terminology is used interchangeably and somewhat indiscriminately, the administrative rule clearly states that the threshold is based on (1) the

number of persons for which the project was designed or (2) the greatest number that the project will accommodate. Minn. R. 4410.4400, subp. 22. If either figure is "20,000 or more," an EIS is mandatory.

■ Here, the 1989 EAW indicated that the project involved an amphitheater "with a peak attendance of 20,000 persons" and maximum seating of 19,500. This statement of peak attendance squarely meets the threshold requiring an EIS. The 2000 EAW, however, simultaneously indicates that the peak attendance will be 19,500 and that it will seat 19,500. The 2000 EAW indicates that it "is an update of a previously approved 1989 EAW for an *identical sized facility* at the same location" (emphasis added). It also states that it is a completely different building and site design. In response to comments and questions about this discrepancy, Burnsville's answer was that the originally stated capacity would be changed to 19,500.

Except for the one reference in the 2000 EAW to a 19,500 peak attendance figure, all other references in the record to 19,500 or 19,700 are to "seating" and "seating capacity." The project is described as providing either 12,300 or 12,500 lawn seats and 7,200 covered seats. The EAW comments also indicate that the actual seats sold are only one part of total attendance at an event. Bloomington noted that many support staff are required for an event, including performers, entourage, security, ticket sales, parking, concessions, and others. The Bloomington mayor noted that on-site staffing of 400–600 would be required for a crowd of 20,000 at the Metrodome. Burnsville did not respond specifically to the comments on the required support staff or to statistics regarding peak attendance exceeding seating capacity in other forums such as the Metrodome or Target Center. It responded to comments generally stating that the

"maximum total occupancy" will never exceed 20,000, and, in its record of decision, stating that the maximum total occupancy of the site, including staff, performers, and crew, will never exceed 20,000. Because these statements indicate that there could be 20,000 people on site, they also meet the threshold set by the rule.

On this record, substantial evidence indicates that the threshold for a mandatory EIS was met.

■ Burnsville argues that the court may consider evidence outside the administrative record to supplement and explain the attendance question. For limited purposes, consideration of evidence outside of the record is permissible if:

(1) the agency's failure to explain its action frustrates judicial review; (2) additional evidence is necessary to explain technical terms or complex subject matter involved in the agency action; (3) the agency failed to consider information relevant to making its decision; or (4) plaintiffs make a showing that the agency acted in bad faith.

*White*, 567 N.W.2d at 735. The *White* court cautioned that a summary-judgment motion cannot be defeated by simply "presenting additional evidence that was not considered by the [agency] when making its decision;" rather, those proffering the additional evidence must show that the agency "failed in its responsibility to prepare an EAW * * *, either by avoiding an issue or by ignoring evidence about an issue that was addressed." *Id.*

As evidence for the courts to consider, Burnsville proffers what it describes as the only source of evidence regarding the "design" of the amphitheater, testimony by designer Greg Vogel. It cites his testimony provided in August 2000, about one month after the ROD was issued, which clarifies his calculation of lawn seating and

supports the figure of 12,300 as the number of lawn seats available. While this testimony contradicts Bloomington's calculation of a much greater lawn-seating capacity, it is otherwise unhelpful in explaining Burnsville's ROD and does not fall within the four categories of permissible additional evidence.

Burnsville also urges this court to consider the PUD agreement dated November 19, 2001, and the Rose Wild agreement with the Metropolitan Council dated December 26, 2001. Both documents were executed almost 18 months after Burnsville's ROD. Both documents state that the maximum occupancy would be 19,700, including performers and staff. These agreements, clearly outside of the RGU's record, also do not fall within the circumstances allowing the reviewing court to consider additional evidence. The agreements reflect a distinct change in the proposal set out in the EAW, which is the basic source upon which the EIS decision is to be based. They do not provide necessary technical evidence unavailable to the RGU, information the agency failed to consider at the time of its decision, or evidence of the agency's bad faith.

Because the record indicates that the threshold for peak attendance was met, the RGU erred in concluding that the mandatory-EIS threshold was not met. Additionally, the limited grounds allowing the courts to consider the proffered additional evidence were not met, so the district court and this court must limit their review to the record before the RGU. Because this court reverses the RGU and remands for a mandatory EIS, we need not review the RGU's decision regarding a discretionary EIS.

### DECISION

The record before the responsible governmental unit and the record of decision both established that the legal threshold for amphitheater size was met, requiring a positive declaration for a mandatory environmental-impact statement.

**Reversed and remanded.**